## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

VICTORIA I. BRIGHTMAN,

    Plaintiff,

-against-

1199SEIU HEALTH CARE EMPLOYEES
PENSION FUND and 1199SEIU RETIREMENT
COMMITTEE,

    Defendants.



No. 18 Civ. 4932 (CM)

## DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

McMahon, C.J.:

On June 4, 2018, Victoria Brightman ("Plaintiff") filed this action against 1199SEIU

Health Care Employees Pension Fund and 1199SEIU Retirement Committee ("Defendants")

seeking relief pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), as

amended, 29 U.S.C. §§ 1132(a)(1)(B), (a)(3)(B), and (g)(1). On November 30, 2018, the Parties

filed claims for summary judgment.

For the reasons stated below, Plaintiff's Motion for Summary Judgment is denied and

Defendants' Motion for Summary Judgment is granted in part and denied in part. Two of

Plaintiff's claims are being remanded to the Fund for reconsideration. This Court will retain

jurisdiction while the Fund reconsiders Plaintiff's claims for benefits in light of the following

opinion.

## I. Factual Background

The factual background is derived from the administrative record and the Local Rule 56.1 statements Plaintiff and Defendants submitted in support of their motions, and in response to their opponent's motion. Denials without support or explanation are treated as admissions. *See Ferring B.V. v. Allergan, Inc.*, 253 F. Supp. 3d 708, 710 (S.D.N.Y. 2015).

### A. The 1199 SEIU Health Care Employees Pension Fund

At issue in this case is the 1199SEIU Health Care Employees Pension Fund (the "Plan"). (Decl. of Stanley D. Baum ("Baum Decl."), Dkt. No. 21, Ex. Q (the "Plan").) The Plan, which is governed by ERISA, covers employees "working under a Collective Bargaining Agreement between a Contributing Employer and 1199SEIU United Healthcare Workers East (the "Union") providing for contributions on [the employee's] behalf to this Pension Fund." (Plan at 14.) Plaintiff is a Plan participant and a Union member. (Defs.' 56.1 Statement of Material Facts in Supp. of their Mot. For Summ. J. ("Defs.' 56.1"), Dkt. No. 27, ¶ 7.)

Plaintiff has brought ERISA claims with respect to the Fund's calculation and payment of her pension benefits.

#### 1. Pension Calculation

Plaintiff's pension is one-twelfth of the following sum: 1.85% of her Average Final Pay multiplied by her Credited Future Service, plus 1.5% of her Past Service Pay multiplied by her Credited Past Service. (*Id.* § 5.2(b) at 148–49.)

"'Average Final Pay' means for each Participant, the highest average Regular Pay during five (5) consecutive Plan Years of employment after his Applicable Effective Date and within his last ten (10) Plan Years of Credited Future Service." (*Id.* § 1.6 at 132).

"'Regular Pay' means for each Participant, his total pay in a Plan Year . . . during periods for which his Contributing Employer is required to make Contributions, excluding overtime, on-

2

call pay, commissions, bonuses and gratuities, and expense allowances." (*Id.* § 1.29 at 137.) "For periods for which the Fund office is unable to obtain actual pay information, Regular Pay shall be calculated utilizing industry standards through a methodology approved by the Retirement Committee." (*Id.*)

"Credited Future Service" is the "total service on and after [Participant's] Applicable Effective Date, credited at the rate of one (1) month for each month for which Contributions are required to be made to the Fund by reason of the Participants employment." (*Id.* § 3.2(a) at 142.) "Credited Past Service" is "determined as of the date such person ceases to be an Employee and . . . it means for each Participant his total service prior to his Applicable Effective Date with all Contributing Employers . . . Service shall not be granted for any service with a Contributing Employer in a job category which has not been included for pension coverage under this Plan (i.e., contributions required) as of the date Participant last worked in [*sic*] Covered Service." (*Id.* § 3.2(b) at 143.)

## 2. Pension Eligibility

Pension payments begin when a Plan participant is eligible for retirement. Eligibility for retirement depends on a number of factors. Plaintiff became eligible on the first of the month following her 65th birthday. (*Id.* § 4.1 at 145.)

After participants are eligible for retirement, they may continue to receive pension benefits even if they become "actively employed," with the following exceptions:

> [E]xcept as required by law, no pension benefit payment shall be made or continue to be made to a Pensioner who is actively employed in full or part-time employment for more than 40 hours per month:
>
> > (a) in the healthcare or human service industry or a related industry (including, but not limited to, hospitals, nursing and convalescent homes, drugstores, laboratories, medical schools, and universities), and

3

> (b) utilizing skills applicable to his previous employment in
> the healthcare or human service or related industry, and
>
> (c) in an Area covered by the Plan and within the meaning
> of "Section 202(a) (3)(B) Service" pursuant to Department
> of Labor Regulations 29 C.F.R. § 2530.203-3(c)(2).

(*Id.* § 11.7 at 175.)

There are specific notice requirements to which the Plan must adhere when an individual

who has received or is eligible for pension is precluded from receiving the pension because of his

or her present work. The Plan requires that:

> A Pensioner whose benefits are suspended as described above and a
> Participant who continues to work for a Contributing Employer
> beyond Normal Retirement Date shall receive (to the extent required
> under ERISA) a notice that includes the information and complies
> with Department of Labor Regulations 29 C.F.R. §2530.203-
> 3(b)(4). Such notice shall be delivered by first class mail or personal
> delivery not later than the end of the first calendar month during
> which benefit payments are suspended.

(*Id.*)

### 3. Disability Benefits

The Plan also provides for disability benefits, which can be claimed earlier than

retirement benefits. Under the Plan, "A Participant who is totally and permanently disabled . . .

shall be eligible to receive a Disability Pension Benefit, provided that the condition or event

giving rise to the total and permanent disability commenced or occurred on or before the last day

of his Credited Service and the Participant's employment with a Contributing Employer

terminated as a result of such condition or event." (*Id.* § 8.1 at 167.) Disability benefits "cease

on the Participant's Normal Retirement Date [the first day of the month after the participant's

65th birthday]. A Participant who is receiving a Disability Pension Benefit may [then] apply for

a Normal Retirement Benefit in accordance with the Plan." (*Id.* § 8.4 at 168.) Disability benefits

are calculated in the same way as retirement benefits. (*Id.* § 8.2 at 167.)

4

### 4. Participant's Appeal Rights

The Plan grants the Plan Administrator and Trustees discretionary authority to interpret the Plan and related Plan documents, decide all matters in connection with entitlement to benefits under the Plan, and make all factual determinations required to administer the Plan and related plan documents. (*See* Plan § IX.G at 92.)

If a Plan participant is denied benefits or believes that his or her pension amount is not correct, the participant has the right to appeal to the Retirement Committee by filing a written request with the Plan Administrator within 60 days of receiving notice of the adverse benefit determination. (*Id.* at § IX.B at 86.) The Retirement Committee must issue a decision during the next quarterly scheduled meeting. (*Id.*) The decision of the Retirement Committee must be made in writing and include an explanation of the decision and the basis for such decision; the decision is final, binding, and conclusive. (*Id.*)

### B. Plaintiff's Relevant Work History

Between 1993 and 2014, Plaintiff worked as a physician's assistant ("PA") on Riker's Island. During this period, she was employed by various hospitals that contracted with New York City to provide medical services on Rikers Island. (Pl.'s Rule 56.1 Statement of Material Facts ("Pl.'s 56.1"), Dkt. No. 23, ¶ 1.)

From July 1993 to March 1994, Plaintiff was employed by Bronx Lebanon Hospital ("Bronx Lebanon"). (*Id.* ¶ 2.)

From 1993 to 1997, Plaintiff worked as a PA in a unit managed by St. Vincent's Catholic Medical Center ("St. Vincent's"). (*Id.* ¶ 3.) Plaintiff contends that while she was employed by St. Vincent's, it was a participating employer in the 1199SEIU Health Employees Pension Fund (the "Fund"). The Fund admits that St. Vincent's Catholic Medical Center was a "Contributing Employer to the 1199SEIU Health Care Employees Pension fund," but asserts that St. Vincent's

5

did not make contributions for [Plaintiff's] job category [of PA]." (*Compare id.* ¶ 4 *with* Decl. of John Eng, Dkt. No. 26, Ex. A ("Admin Record") at 17.)

From January 1998 through around December 2000 – Plaintiff says December 2000 but the document included in the administrative record says January 2001 – Plaintiff worked as a PA employed by St. Barnabas Hospital. (Pl.'s 56.1 ¶ 5; Admin Record at 56.) Her position was governed by a contract collectively known as the "Riker's Island Contract." (Pl.'s 56.1 ¶ 5.)

While Plaintiff was working for St. Barnabas, Local 1199SEIU (the "Union") began organizing the St. Barnabas PAs to join the Union. (*Id.* ¶ 6.) Plaintiff says that during the organizational efforts, Mark Bergen, a Union organizer, informed the PAs, including Plaintiff, that if they joined the Union, St. Barnabas would credit their pre-1998 service as PAs. (Admin Record at 7, 61; Aff. of Victoria Brightman in Supp. of Mot. for Summ. J. ("Brightman Aff."), Dkt. No 20, ¶ 7.) Plaintiff contends that this means that her three years at St. Vincent's qualify for past service credit, because she was covered as a PA while employed by St. Vincent's. (Pl.'s 56.1 ¶ 8.)

Plaintiff claims that she relied on Bergen's promise when she decided to join the Union in 1998. (Admin Record at 7, 61; Pl.'s 56.1 ¶ 9.)

In early 2001, Plaintiff began working as a PA for Corizon Health, Inc. ("Corizon"), when it took over the contract for the provision of health care services at Rikers Island. Corizon assumed a contribution obligation to the Fund beginning in January 2001. The first date on which the Fund received contributions on behalf of PAs for Riker's Island and Manhattan House, including Plaintiff, was January 1, 2001. (Defs.' Resp. to Pl.'s Rule 56.1 Statement of Material Facts, Dkt. No. 32, ¶ 10.)

6

At all times while Plaintiff was employed by Corizon, it was a contributing employer to the Fund. Corizon contributed to the Fund on behalf of all of its PAs, including Plaintiff. (Pl.'s 56.1 ¶ 11.)

In her role as a PA at Corizon, Plaintiff's duty was to provide direct patient care by, among other things, performing CPR, taking blood pressures, administering stiches, and, more generally, caring for and treating injured patients. (Pl.'s 56.1 ¶ 12; Admin Record at 83.)

In May 2014, Plaintiff became physically disabled. Her disability requires her to use a wheelchair. (Pl.'s 56.1 ¶ 14.) She stopped working at Corizon because of her disability. (*Id.*)

Plaintiff was unable to work at all from May 5, 2014 to May 16, 2016, due to her disability. (*Id.* ¶ 15.)

On May 16, 2016, Plaintiff began employment with the Physician Affiliate Group of New York, P.C. ("PAGNY"), which had replaced Corizon as the employee of PAs at Rikers Island. (*Id.*) PAGNY participates in the Fund. (*Id.*)

At PAGNY, Plaintiff holds the title of PA, but she asserts that her duties as a PA with PAGNY are very different from when she was a PA at Corizon. At PAGNY, she acts as a "computer operator, who reviews the work of physicians and PAs;" she no longer meets with, cares for, and treats injured patients, as she did in her previous role as PA with Corizon. (Admin Record at 83.) As Plaintiff now requires the assistance of a wheelchair, employing her in a non-patient care role seems appropriate.

Plaintiff's employment with PAGNY continues on and off due to physical problems resulting from her injury. (*Id.*) Since December 2017, Plaintiff has consistently worked less than 40 hours per month at PAGNY. (Pl.'s 56.1 ¶ 72.) She did not work for PAGNY at all

7

between December 2017 and June 2018. Currently, she works one day a week. (Brightman Aff. ¶ 17.)

## C. Plaintiff's Disability and Pension Payments from November 2014 to October 2016

In November 2015, Plaintiff applied for disability pension from the Fund. She sought benefits retroactively effective to May 2014, when she had to stop working for Corizon. (Pl.'s 56.1 ¶ 17; Admin Record at 29.)

Pursuant to the Plan, Plaintiff's eligibility for disability pension benefits started on the effective date of her Social Security disability payments, which was November 2014. (Admin Record at 22–23, 29.) Plaintiff was eligible for disability pension up until April 1, 2015, the first day of the month after her 65th birthday. On this day, per the terms of the Fund, Plaintiff's disability pension was converted to a normal retirement pension (which, in reality, made little difference, as the pension amounts are the same). (Pl.'s 56.1 ¶¶ 18, 20; Admin Record at 78.)

Plaintiff received her first payment from the Fund in January 2016. (Admin Record at 1.) Although the Fund had informed Plaintiff in writing that she would receive $1,963 per month (Admin Record 9-11), her initial payments were only in the amount of $1,692 (Pl.'s 56.1 ¶ 21).

On February 12, 2016, one month after receiving her first payment, Plaintiff wrote a letter to the Fund, "appealing the amount of the disability award" that had been awarded the December 17, 2015 letter. She asked about the calculation of her benefits and demanded that she be granted past service for the period when she was employed by St. Vincent's. (Admin Record at 39.)

On April 25, 2016, the Fund responded that, at the time Plaintiff left St. Vincent's, PAs employed there were not covered by the Fund, so she was not entitled to past service credit for those years. (Admin Record at 43.)

8

On August 5, 2016, Plaintiff sent another letter to the Fund, asking why the calculation of her pension was lower than she was advised it would be. She again demanded that she receive the promised pension benefit. (Admin Record at 46.)

### D. Termination of Plaintiff's Benefits in November 2016

The Fund paid Plaintiff's pension benefits through October 2016. It stopped paying her in November 2016. (Pl.'s 56.1. ¶¶ 19, 23.) The payments were terminated because the Fund determined that Plaintiff's employment with PAGNY, which began in May of 2016, precluded her from receiving pension benefits.

The administrative record contains a letter dated September 2, 2016, which the Fund claims it sent to Plaintiff. The letter stated that because Plaintiff's current employment (with PAGNY) was considered "Related Employment," Plaintiff was not eligible to receive a pension benefit for any month in which she had worked, or was paid for, at least forty hours by PAGNY. (Admin Record at 49.) Although the Fund recognized that Plaintiff began her employment with PAGNY prior to November 2016, she was not required to pay back the benefits that she had already received. (Defs.' 56.1 ¶ 20.)

Plaintiff claims that she did not receive this letter or any other notice that her benefits had been stopped. (Admin Record at 68; Brightman Aff. ¶ 22.).

The administrative record also contains an October 3, 2016 letter from the Fund to Plaintiff. (Admin Record at 92.) Like the September letter, it advised Plaintiff that, due to her active employment, she would not be receiving her pension benefits until she fully retired or reached the age of 70.5. (*Id.*)

Plaintiff also claims that she did not receive this letter. (*Id.* at 68.)

9

## E. The Fund's Calculation of Plaintiff's Benefits

In December 2016, two months after Plaintiff's benefits were suspended, Plaintiff received two letters from the Fund responding to her earlier inquiries.

In a letter dated December 5, 2016, the Fund wrote, "*Currently*, you are receiving a monthly pension benefit inclusive of any increases approved by the Board of Trustees." (Admin Record at 12 (emphasis added).) Plaintiff was not "currently" receiving any benefits in December 2016; they had been suspended as of a month earlier. The Fund informed Plaintiff that her pension benefit had been recalculated to be $1,861, and that she was entitled to retroactive payment of $3,652.46 for the period from December 1, 2014 to October 1, 2016 – which reflects back payment for the period of time before Plaintiff's benefits were suspended. (*Id.*) The fact that the Fund said that she was covered through October 1, 2016 corresponds with the suspension of Plaintiff's benefits, but is in clear contrast with the first line of the letter.

Plaintiff confirms that she received this letter and a check for the underpayments. (Pl.'s 56.1 ¶¶ 25–27.) Notably, this letter was sent to the same address as the two letters notifying Plaintiff that her benefits had been suspended (which she claims she did not receive) – 49 Kaufman Ave, Little Ferry, NJ 07643. (Admin Record at 12, 49, 68.)

The Fund sent Plaintiff a second letter nine days later, on December 14, 2016. (Admin Record 56–58.) The letter explained in detail the recalculation that had been addressed in the December 5 letter. (*Id.*). This letter was the first time that Plaintiff received a detailed description of how her benefits were calculated.

The letter explained that the Fund calculated Plaintiff's benefits using two formulas, which were then added together.

First, benefits for periods of credited future service were calculated as follows: 1.85% * Final Average Pay ("FAP") * Years of Credited Future Service. (*Id.*)

10

The Fund averaged the following figures as Plaintiff's wages for the purpose of determining her FAP: 2009 – $67,998.06; 2010 – $90,664.08; 2011 – $92,163.49; 2012 – $92,447.32; and 2013 – $93,055.30. (Admin Record at 57.) The Fund calculated Plaintiff's FAP to be $87,271.65. (*Id.*)

The letter said that Plaintiff's wages were obtained from Plaintiff's "former employer, Richmond University Medical Center." (*Id.*) But Plaintiff never worked for Richmond University Medical Center. (Pl.'s 56.1 ¶ 33.) The Fund credited Plaintiff with 13 years of future service – one month for her work with St. Barnabas and the rest from her time with Corizon. (Admin Record 52–58.)

Second, Plaintiff's benefits for periods of credited past service were calculated as follows: 1.5% * 1980 Wages * Credited Past Service. (*Id.* At 57.) Plaintiff's 1980 wages were calculated by taking Plaintiff's wages on January 1, 2001, multiplying them by a .418 step back factor, and then multiplying this number by 52 to get a yearly wage. The Fund credited Plaintiff with three years and seven months of past service, for work performed from July 1993 to March 11, 1994 at Bronx Lebanon, and from January 1, 1998 to December 2000 at St. Barnabas. (Pl.'s 56.1 ¶ 36.) Plaintiff did not receive credited past service for her work as a PA with St. Vincent's. (*Id.* ¶ 37.)

Application of this formula led the Fund to conclude that Plaintiff's pension was $1,861.00 per month.

The December 14 letter also included Plaintiff's right to request an appeal within sixty days from the date of the letter. (Admin Record at 58.)

The Fund claims that these letters should not be read as indicating that the Fund believed that it had any obligation to continue paying benefits to Plaintiff after October 2016. While the

11

first letter used the word "currently," it also clearly states that Plaintiff would receive retroactive pay only through October 2016.

## F.    Plaintiff Challenges the Calculation of Her Benefits (February 2, 2017 Letter and Response)

On February 2, 2017, Plaintiff's counsel sent a letter to the Fund, demanding that the Fund pay Plaintiff benefits owed for the months of November 1, 2016 to February 1, 2017, and that the Fund continue to pay her benefits thereafter. (Admin Record at 60–62.) The letter also demanded that (1) Plaintiff be credited with service for her employment with the St. Vincent's unit at Rikers's Island from 1993 to 1997, because credit for that service had been promised by Mark Bergen, a Union organizer (*id.* at 61), and that (2) the Fund recalculate Plaintiff's FAP using information obtained from Corizon, the Social Security Administration, or Plaintiff's records (which were outlined in the letter and provided to the Fund), rather than the information purportedly obtained from Richmond University Medical Center, for which Plaintiff never worked (*id.*). Plaintiff's counsel calculated her correct FAP to be $103,244.3, as compared to the Fund's calculation of $87,271.65. (*Id.* at 62.)

Plaintiff's counsel claims that at the time he sent this letter, neither he nor Plaintiff had notice that her benefits had been suspended due to her employment with PAGNY. (Pl.'s 56 1 ¶ 50.)

On April 19, 2017, the Fund sent Plaintiff's counsel a response. (Baum Decl. Ex. G.)[1] The Fund denied all of Plaintiff's counsel's requests. (Admin Record at 64–65; Baum Decl. Ex. G.) Specifically, the Fund explained that: (1) Plaintiff's work with PAGNY for more than forty hours per month disqualified her from receiving any pension benefits, starting when she was

---

[1]    The Court cites to the Baum declaration because the administrative record is missing the second page of this letter.

employed with PAGNY;[2] (2) the Fund had sent Plaintiff a letter explaining this rule on September 2, 2016; (3) Plaintiff received disability benefits through November 2014 and, therefore, was not eligible for Pension benefits during that period; (4) Plaintiff's employment from 1993–1997 could not be credited because during that time she was under the St. Vincent's contract, and past service credit was not awarded until St. Barnabas took over the contract, which occurred on January 1, 1999; (5) the Fund had reached out to Corizon to verify the earnings numbers that Plaintiff provided because it wanted to ensure that these numbers did not include overtime, but also asked that Plaintiff provide documentation for her earnings for this period;[3] (6) the Fund had used Plaintiff's weekly salary and industry standard wages to calculate her FAP; and (6) industry standard wage had also been used to determine her wage on the applicable Effective Date (January 1, 2001), which was then adjusted to establish her 1980 base pay for purposes of calculating her past service pay. (*Id.*)

Plaintiff claims that this letter is the first time that she received notice that her benefits had been suspended. (Pl.'s 56.1 ¶ 50.)

## G. Plaintiff Appeals the Fund's Termination of Benefits (June 15, 2017 Letter and Response)

On June 15, 2017, Plaintiff's counsel officially appealed the Fund's decision. (Admin Record at 6–8.)

In her notice of appeal, Plaintiff repeated all of her prior demands – reinstatement of her monthly payments, payment of the missed monthly payments, and an adjustment to reflect what she believed to be the correct pay and credited service. (*Id.*) Plaintiff informed the Fund that she

---

2  In this letter, the Fund incorrectly identified Plaintiff's start date with PAGNY as January 1, 2016, when it was May 1, 2016. (Admin Record at 64.)
3  The Fund asserted that it could not rely on Social Security Administration records because overtime was not part of the formula for FAP.

13

had never received a copy of the "forty hour letter" suspending her benefits, and listed six other individuals who she believed were being credited by the Fund for services as PAs on Rikers Island at the time she was working for St. Vincent's (service for which Plaintiff was not credited). Finally, after pointing out that the Fund was required to maintain accurate records of a participant's pay pursuant to ERISA, she insisted that the Fund, not she, should bear the responsibility of obtaining the actual numbers of Plaintiff's pay from Corizon – or else should use the base pay Plaintiff had provided. (*Id.* at 6–7.)

Plaintiff included with her appeal letter personal records of her wages for the years relevant for her FAP, including pay stubs and W-2 forms. (*Id.*; Pl.'s 56.1 ¶ 52; Admin Record at 14–15, 21.) Plaintiff claimed that her FAP should be calculated using the following wages: 2009 – $81,056.92; 2010 – $99,730.80; 2011 – $94,402.66; 2012 – $123,291.62; and 2013 – $122, 854.58. (Pl.'s 56.1 ¶¶ 52, 55; Admin Record at 61– 62.)[4] Plaintiff claims that none of these wages include overtime, on-call pay, commissions, bonuses, gratuities or an expense allowance (Brightman Aff. ¶ 30) – all of which are not includable for pension calculation purposes per the terms of the Plan.

Michael Kaiser ("Kaiser"), the Chief Pension Officer of the Fund, responded to Plaintiff's counsel on August 3, 2017. (Baum Aff. Ex. J.)[5] The letter confirmed that the Fund still found Plaintiff ineligible to collect benefits as of November 1, 2016. It also asserted that her FAP had been calculated correctly, based on the information available to the Fund; her time with St. Vincent's could not be included in the past service calculation; and her disability benefits commenced on the appropriate date. (*Id.*) Attached to this letter were copies of the two letters

---

[4]     Plaintiff's wages for 2010–2011 were significantly lower than the following two years because Plaintiff took unpaid medical and family leave during this period. (Pl.'s 56.1 ¶ 53.)
[5]     The Court cites to the Baum declaration because the administrative record is missing the first page of this letter.

14

the Fund claims to have sent to Plaintiff on September 2, 2016 and October 3, 2016, informing Plaintiff that her benefits had been suspended. (Pl.'s 56.1 ¶ 60.) Neither letter informed Plaintiff of the Plan's review procedures, as required by ERISA regulations. (*Id.* at ¶ 60; *see also* 29 CFR 2530.203–3(b)(4).)

## H.    Appeal Hearing and Supplemental Memoranda

A hearing on Plaintiff's appeal was scheduled before the Retirement Committee for August 23, 2017. (Pl.'s 56.1 ¶ 61; Baum Decl. Ex. J at 3.) Plaintiff and her counsel attended the hearing. (Admin Record at 101.)

Prior to the hearing, Plaintiff's counsel set the Fund a "supplemental memorandum" dated August 15, 2017, which described the basis for her appeal. (Admin Record at 68; Pl.'s 56.1 ¶ 62.) Counsel stated that the appeal was based on the February 2, 2017 and June 15, 2017 letters, as well as the following additional issues: (1) Plaintiff was never provided with an updated Plan summary description for 1199SEIU and was never otherwise informed about the suspension of benefits rule or given any notice that her benefits were being suspended; (2) her service for St. Barnabas should be treated as future service; and (3) the source of the wages used for her FAP calculation was not clear and the wages should have been based on the pay stubs she submitted or information from Corizon. (*Id.*)

After the hearing, the Retirement Committee "pended the appeal" to allow Plaintiff's counsel the opportunity to file an official appeal covering the new issues raised at the meeting but not raised in the first-level or initial second-level appeal. (Defs.' 56.1 ¶ 28.) At the request of the Retirement Committee, Plaintiff's counsel submitted a second "supplemental memorandum." This memorandum described the differences between Plaintiff's job as a PA with PAGNY and her job as a PA with Corizon and argued that a suspension should not be

imposed because of the difference in duties. It outlined what Plaintiff argued was the correct calculation for years of service and FAP. And it demanded a description of the calculation of Plaintiff's monthly pension benefits from the Fund and the amount actually paid to Plaintiff. (Admin Record 83–84.)

The Fund responded to Plaintiff's supplemental memorandum on November 20, 2017; this response was considered a first-level response to the new issues raised in the supplemental memorandum. (Admin Record 86– 87; Defs.' 56.1 ¶ 29.)

The Fund maintained that it had mailed suspension letters to Plaintiff. It rejected Plaintiff's argument that she could still receive benefits because she does not use the same skills as a PA for PAGNY, saying: "Although Ms. Brightman does not, by her account, use the same skills as she used in her previous position as a PA, that fact is irrelevant to the Plan's rules: Regular hours in any position in Covered Employment triggers the Suspension of Benefits rule, *Irrespective of duties*." (Admin Record at 86 (emphasis added).)

The Fund also denied Plaintiff's challenges to the years of service calculation, explaining that St. Vincent's was not included at all and that her time at St. Barnabas was past service (not future service) until January 2001, when St. Barnabas joined the Fund. The letter read, "The Fund does not have, and could not obtain, a copy of the St. Barnabas Collective Bargaining Agreements . . . but recorded the effective date contemporaneously with the event." (*Id.*)

Finally, the Fund rejected Plaintiff's challenge to her FAP calculation, explaining that, while it had received her wage information from Corizon, Corizon did not specify whether the wages did or did not include overtime. As a result, the Fund deemed the information unusable. It also said that Corizon had not responded to a follow-up inquiry. (*Id.* at 2.)

Plaintiff's counsel did not respond to this first-level response with new inquiries and did not submit any new arguments for the Retirement Committee to consider in its decision on the second-level appeal. (Defs.' 56.1 ¶ 29.)

## I. The Retirement Committee Denies Plaintiff's Appeal

On December 8, 2017, Plaintiff's counsel received notice from the Retirement Committee that Plaintiff's appeal was denied in almost all respects. (Admin Record at 98–100.)

The notice said: "The Committee noted the Fund's determination that [Plaintiff's] Average Final Pay should be re-calculated to include a shift differential. The Committee otherwise upheld the Fund's determination that no other changes to [Plaintiff's] benefit amount were warranted." (*Id.*) The letter outlined the bases for the denial: (1) her service at St. Barnabas was properly included as past pay; (2) her service at St. Vincent's was not; (3) her FAP (updated to include the shift deferential) was correctly calculated; and (4) the suspension of benefits was proper. (*Id.*) The letter did not include an FAP calculation or advise when and how she would receive money due her as a result of the shift differential. The letter also identified the relevant Plan sections on which the Committee relied in making its decision. (*Id.*; Defs.' 56.1 ¶ 32.)

Plaintiff has not yet received any lump sum retroactive payment for the shift differential or any notice recalculating her benefits. (Brightman Aff. ¶ 23.) She currently is not receiving any pension payments. (*Id.*)

She appeals from the decision of the Committee.

17

## II.    Discussion

### A.    Legal Standard

Summary judgment is granted where all submissions, taken together, show there is "no genuine dispute as to any material fact" and that the moving party is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

The moving party has the burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 322–23. A fact is considered "material" if it "affect[s] the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. There is a "genuine issue" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### B.    ERISA

The Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132, provides that a person denied benefits under an employee benefits plan may challenge that denial in federal court. Under section 502(a)(2)(B), "A civil action may be brought . . . to recover benefits due to [the plaintiff] under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." *See* 29 U.S.C. § 1132(a)(1)(B). Under section 502(a)(3)(B), "A civil action may be brought. . . to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." *Id.* at (a)(3)(B).

A summary judgment motion is a "vehicle whereby the Court can apply substantive ERISA law to the administrative record." *S.M. v. Oxford Health Plans (N.Y.), Inc.*, 94 F. Supp. 3d 481, 497 (S.D.N.Y. 2015), *aff'd sub nom. S.M. v. Oxford Health Plans (N.Y.)*, 644 F. App'x 81 (2d Cir. 2016) (quoting *Gannon v. Aetna Life Ins. Co.*, No. 05-CV-2160 (JGK), 2007 WL

18

2844869, at \*6 (S.D.N.Y. Sept. 28, 2007)). ERISA itself "does not set out the applicable standard of review for actions challenging benefit eligibility determinations." *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002) (quoting *Zuckerbrod v. Phoenix Mut. Life Ins. Co.*, 78 F. 3d 46, 49 (2d Cir. 1996)). "Substantive ERISA law determines the proper standard of review that the Court should apply in reviewing the decision of the plan administrator, as well as whether the Court can consider materials beyond the administrative record." *Gannon*, 2007 WL 2844869, at \*6. The Supreme Court has held that a "denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Fay*, 297 F. 3d at 103 (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). However, where a plan grants the administrator discretionary authority to determine eligibility benefits, the court applies a deferential standard of review. *See McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 132 (2d Cir. 2008).

## 1. The Arbitrary and Capricious Standard Applies

The Parties agree that the Plan grants the Fund Trustees discretionary authority to interpret the Plan and related Plan documents. Thus, the Court "will not disturb the administrator's ultimate conclusion unless it is 'arbitrary and capricious.'" *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 82 (2d Cir. 2009) (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995)); *see also Firestone*, 489 U.S. at 115.

Under arbitrary and capricious review, the "scope of review is narrow." *O'Shea v. First Manhattan Co. Thrift Plan & Tr.*, 55 F.3d 109, 112 (2d Cir. 1995). An administrator's decision is arbitrary and capricious when it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *McCauley*, 551 F.3d at 132 (quoting *Pagan*, 52 F.3d at 442). Courts have defined "substantial evidence" as "evidence that a reasonable mind might accept as

19

adequate to support the conclusion reached by the administrator;" substantial evidence "requires more than a scintilla but less than a preponderance." *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 141 (2d Cir. 2010) (quoting *Celardo v. GNY Auto. Dealers Health & Welfare Tr.*, 318 F.3d 142, 146 (2d Cir. 2003)); *see also Sandoval v. Aetna Life and Casualty Ins. Co.*, 967 F.2d 377, 382 (2d Cir. 1995). "Where both the trustees of a pension fund and a rejected applicant offer rational, though conflicting, interpretations of plan provisions, the trustees' interpretation must be allowed to control . . . [but] where the trustees of a plan impose a standard not required by the plan's provisions, or interpret the plan in a manner inconsistent with its plain words, or by their interpretation render some provisions of the plan superfluous, their actions may well be found to be arbitrary and capricious." *O'Shea*, 55 F.3d 109 at 112 (internal citations removed).

## 2. The Court's Review is Limited to the Administrative Record

"For a review under the arbitrary and capricious standard . . . a district court's review . . . is limited to the administrative record." *Valentine v. Aetna Life Ins. Co.*, 125 F. Supp. 3d 425, 438 (E.D.N.Y. 2015) (internal quotation removed) (citing cases); *see also Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995). In ERISA cases applying an arbitrary and capricious standard of review, the Second Circuit has "repeatedly said that a district court's decision to admit evidence outside the administrative record is discretionary," and that this "discretion ought not to be exercised in the absence of good cause." *Wedge v. Shawmut Design & Const. Grp. Long Term Disability Ins. Plan*, 23 F. Supp. 3d 320, 337 (S.D.N.Y. 2014) (quoting *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 631 (2d Cir. 2008)).

Neither Party has presented this court with "good cause" to review evidence beyond the administrative record. *See Joyner v. Cont'l Cas. Co.*, 837 F. Supp. 2d 233, 240 (S.D.N.Y. 2011). Although "extra-record evidence might sometimes be admissible to assist procedural inquiries,"

it is not admissible for the purpose of challenging the substantive determination. *Richard v. Fleet Fin. Grp. Inc. Ltd. Employee Benefits Plan*, 367 F. App'x 230, 233 (2d Cir. 2010). Accordingly, the only "extra record" evidence that the Court will consider in this case are documents that *should* be in the record but have been omitted due to Defendants' carelessness in filing an incomplete record (and one in which documents and pages are out of order). *See Burgio v. Prudential Life Ins. Co. of Am.*, 253 F.R.D. 219, 229 (E.D.N.Y. 2008) (extra-record evidence may be relied upon to the "the exact nature of the information considered by the fiduciary in making its decision").

## C. Parties' Motions for Summary Judgment

Plaintiff suggests four aspects of the Retirement Committee's decision that are arbitrary and capricious: the suspension of Plaintiff's benefits; the calculation of Plaintiff's FAP; the denial of future service credit for her work at St. Barnabas; and the failure to give Plaintiff past service credit for work performed while she was employed by St. Vincent's.

Defendant has also moved for summary judgment, arguing that the suspension of benefits was consistent with the law and the Plan, and the determination of Plaintiff's pension was reasonable and supported by the evidence.

Nowhere in her summary judgment papers does Plaintiff argue that she received "unfavorable treatment" with respect to the calculation of her benefits when compared with Susan Noah, as alleged in the "Fourth Claim for Relief" in the Complaint. (Dkt. No. 1.) Because this claim has not been addressed, the Court deems it abandoned. *See Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) ("Where abandonment by a counseled party is not explicit but such an inference may be fairly drawn from the papers and circumstances viewed as a whole, district courts may conclude that abandonment was intended.").

**D.    Suspension of Plaintiff's Benefits**

**1.    Applicable Plan Provisions and Related Regulations**

Plaintiff's benefits were suspended pursuant to Section 11.7 of the Plan.  Section 11.7

says:

> [E]xcept as required by law, no pension benefit payment shall be
> made or continue to be made to a Pensioner who is actively
> employed in full or part-time employment for more than 40 hours
> per month: (a) in the healthcare or human services industry . . . *and*
> (b) utilizing skills applicable to his previous employment in the
> healthcare or human service or related industry, *and* (c) in an Area
> covered by the Plan and within the meaning of 'Section 202(a)(3)(B)
> Service' pursuant to Department of Labor Regulations 29 C.F.R.
> §2530.203-3(c)(2).

(Plan § 11.7 (emphases added).)

A "Section 202(a)(3)(B) service" is defined by the Code of Federal Regulations.  It

means when the employee in a monthly payroll:

- completes 40 or more hours of service or "receives payment
  for any such hours of service performed on each of 8 or more
  days (or separate work shifts) in such month or payroll
  period";

- in "an industry in which employees covered by the plan were
  employed and accrued benefits under the plan as a result of
  such employment at the time that the payment of benefits
  commenced or would have commenced if the employee had
  not remained in or returned to employment";

- in "a trade or craft in which the employee was employed at
  any time under the plan"; and

- in the "geographic area covered by the plan at the time that
  the payment of benefits commenced or would have
  commenced if the employee had not remained in or returned
  to employment."

*See* 29 CFR 2530.203-3(c)(2).

Section 11.7 also requires that the Fund provide notice to the participant that his or her benefits are being suspended. Notice must include "the information [about the suspension] and compl[y] with Department of Labor Regulations 29 C.F.R. §2530.203-3(b)(4)." (Plan § 11.7.) This means that notice must be delivered by personal delivery or first class mail "not later than the end of the first calendar month during which benefit payments are suspended," contain a description of the reasons why the payments are being suspended and the relevant plan provisions, and reference the applicable CFR provisions. (*Id.*; *see also* 29 C.F.R. § 2530.203-3(b)(4).) The notice must also include the Plan's procedures for affording review of the suspension. *See* 29 C.F.R. § 2530.203-3(b)(4).

## 2. The Retirement Committee's Decision was Arbitrary and Capricious

Plaintiff makes three arguments as to why the suspension of her benefits was arbitrary and capricious: (1) The Fund did not follow the Plan and ERISA in determining the suspension; (2) Plaintiff's work at PAGNY was not in the same trade or craft as her work at Corizon; and (3) Plaintiff did not receive appropriate notice before her benefits were suspended. (Mem of Law in Supp. of Pl. Victoria Brightman's Mot. for Summ. J. ("Pl.'s Br."), Dkt. No. 22, at 11–17.) Defendants argue that the decision was consistent with the Plan and ERISA.

I find that the Fund's decision was arbitrary and capricious.

### a) The Fund was Required to Compare Plaintiff's Skills as a PA at Corizon and PAGNY Prior to Suspending Her Benefits.

First, Plaintiff argues that the Fund did not apply the correct criteria when determining whether her benefits should be suspended because it did not consider whether she was utilizing skills relevant to her prior employment, a requirement she must satisfy for her benefits to be suspended.

23

There can be no question that the Fund did not make the necessary comparison; indeed, it did not believe that it had to. In a November 20, 2017 letter, Kaiser, the Fund's Chief Pension Officer, asserted, "Although [Plaintiff] does not, by her account, use the same skills as she used in her previous position as a PA, that fact is irrelevant to the Plan's rules: *Regular hours in any position in Covered Employment triggers the Suspension of Benefits rule, irrespective of duties*." (Admin Record at 86 (emphasis added).) But that interpretation is inconsistent with the plain language of the Plan.

Second Circuit courts apply "familiar rules of contract interpretation in reading an ERISA plan." *Lifson v. INA Life Ins. Co. of N.Y.*, 333 F.3d 349, 353 (2d Cir. 2003). Plans are reviewed "as a whole, giving terms their plain meaning" and interpreted "in an ordinary and popular sense as would a person of average intelligence and experience." *Montefiore Med. Ctr. v. Local 272 Welfare Fund*, 712 F. App'x 104, 106 (2d Cir. 2018) (summary order) (internal citations removed). In New York, "No ambiguity exists when contract language has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Trs. of the Sheet Metal Workers' Nat. Pension Fund v. Steel & Duct Fabrication, Inc.*, 124 F. Supp. 3d 187, 196 (E.D.N.Y. 2015) (quoting *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993)).

The Plan could not be clearer. In order for Plaintiff's benefits to be suspended, she *must* be in a position where she is "using skills applicable to [her] previous employment in the healthcare or human services industry." Among other things, the Plan says that no pension benefit shall be made or continue to be made for a pensioner who is working for more than 40 hours per month *and* is using skills applicable to her previous employment. (Plan § 11.7 at 175.)

24

The use of "and" means that both requirements must be satisfied; this is not an either/or determination, as the Fund argues. *See Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 244 (N.Y. 2014) ("The words and phrases used by the parties must, as in all cases involving contract interpretation, be given their plain meaning."). Plaintiff must meet all of the required criteria for her benefits to be suspended, and any decision that was made not using all the criteria is arbitrary and capricious. *See Pesca v. Bd. of Trs., Mason Tenders' Dist. Council Pension Fund*, 879 F. Supp. 23, 25 (S.D.N.Y. 1995) ("departure from the clearly defined terms of the Plan" is arbitrary and capricious).

The Plan also states that, for a participant's pension to be suspended, she must be in an area "within the meaning of 'Section 202(a)(3)(B) Service' pursuant to Department of Labor Regulations 29 C.F.R. § 2530.203-3(c)(2)." (Plan § 11.7.) Defendants appear to argue that "within the meaning of 'Section 202(a)(3)(B) Service'" only requires that Plaintiff work more than 40 hours. (Mem. of Law in Supp. of the Mot. For Summ. J. of Defs. ("Defs.' Br."), Dkt. No. 28, at 11–12.) But that argument is based on an incorrect reading of the statute, to which this Court is not obligated to give any deference – even under an "arbitrary and capricious" standard of review – because it is an interpretation (or, in this case, a misinterpretation) of law.

The relevant section of the Code of Federal Regulations reads as follows:

> (2) *Multiemployer plans.* In the case of a multiemployer plan, as defined in section 3(37) of the Act, the employment of an employee subsequent to the time the payment of benefits commenced or would have commenced if the employee had not remained in or returned to employment results in section 203(a)(3)(B) service during a calendar month, or during a four or five week payroll period ending in a calendar month, if the employee, in such month or payroll period:
>
> - Completes 40 or more hours of service (as defined in § 2530.200b-2(a)(1) and (2)) *or*

- Receives payment for any such hours of service performed on each of 8 or more days (or separate work shifts) in such month or payroll period, *Provided,* That the plan has not for any purpose determined or used the actual number of hours of service which would be required to be credited to the employee under § 2530.200(b)-(2)(a); *in*

- An industry in which employees covered by the plan were employed and accrued benefits under the plan as a result of such employment at the time that the payment of benefits commenced or would have commenced if the employee had not remained in or returned to employment, *and*

- A trade or craft in which the employee was employed at any time under the plan, *and*

- The geographic area covered by the plan at the time that the payment of benefits commenced or would have commenced if the employee had not remained in or returned to employment.

(29 C.F.R § 2530.203-3(c)(2) (emphases added).)

Defendants argue that this regulation should be read as requiring either that: (1) the employee completes 40 hours of service, or (2) the employee is paid for hours of service performed on eight or more days in a month (i) in an industry in which employees covered by the plan were employed at the time payment of benefits commenced, (ii) in a trade or craft in which the employee was employed at any time under the plan, and (iii) in a particular geographic area. Put otherwise, Defendants argue that the regulation should be read to apply the three "industry/trade or craft/geographic" criteria only when the employee was paid for services performed on eight or more days in a month – but not when the employee has completed 40 hours of service.

First, I again note that the interpretation of this regulation from the Code of Federal Regulations is a matter of statutory interpretation – not interpretation of the terms of the Plan – so the Court owes no deference to the Fund's interpretation of the regulation.

Second, it is obvious that whoever interpreted the regulation in the manner described above does not know his/her grammar.

The regulation is drafted in the following form: either A or B; plus C1, C2, and C3. Note the placement of the semicolon. It appears, not immediately before the "or" between A and B, but after "B." That means that "Either A or B" is one group, and "C1, C2 and C3" is another group – one that modifies "Either A or B." Were Defendants' reading of the regulation correct, the comma would have to appear before the "or" that separates A and B (A being "40 hours of service;" B being "gets paid for services performed on 8 or more days in a month"), and there would be a comma, not a semicolon, after B (the paragraph that discussed getting paid for services performed on 8 or more days in a month). But that is not the way the regulation is written.

Of course, the fact that Plaintiff is not seeing patients does not necessarily mean she is not "using skills applicable to [her] previous employment;" it could well be the case that at PAGNY, Plaintiff is using the same skills she employed earlier as a PA in her review of the work of other PAs and physicians. But nothing in the administrative record suggests that anyone associated with the Fund ever thought about this issue, even though Plaintiff's counsel raised this argument in his written appeals, at the hearing, and in his post-hearing memorandum. (Admin Record at 101–09.) Indeed, at the Retirement Committee's meeting to make a final decision on Plaintiff's appeal, the only notation in the minutes about the suspension is that the, "Trustees reviewed the Fund's suspension of benefits letter sent to the member because she was working more than 40 hours per month while in Covered Employment" and "noted that the member is currently working and will not receive additional pension payments, until she retires again." (*Id.* 107–09). There was no discussion about how the Fund determined that Plaintiff was in "covered

employment," despite the fact that, in his supplemental memorandum following the August 15, 2017 hearing, Plaintiff's counsel described her current job as a "computer operator, who reviews the work of physicians" and specifically wrote that "she does not use the same skills as her previous job of a PA, where she met, cared for and treated injured patients." (Admin Record at 83.)

If, based on the administrative record, a district court "concludes that the Trustees' decision was arbitrary and capricious, it must remand to the Trustees with instructions to consider additional evidence, unless no new evidence could produce a reasonable conclusion permitting denial of the claim or remand would otherwise be a useless formality." *Miller*, 72 F.3d at 1071 (internal quotation omitted); *Cejaj v. Bldg. Serv. 32B-J Health Fund*, No. 02 CIV. 6141 RMBMHD, 2004 WL 414834, at *10 (S.D.N.Y. Mar. 5, 2004). Accordingly, the Fund's motion for summary judgment must be denied and the matter remanded for further proceedings. *See Crocco v. Xerox Corp.*, 137 F.3d 105, 108 (2d Cir. 1998); *Valentine v. Aetna Life Ins. Co.*, 125 F. Supp. 3d 425, 444 (E.D.N.Y. 2015); *Cook v. N.Y. Times Co. Long-Term Disability Plan*, No. 02 CIV. 9154 (GEL), 2004 WL 203111, at *6 (S.D.N.Y. Jan. 30, 2004) ("full and fair review" includes "having the decisionmaker consider the evidence presented by both parties prior to reaching and rendering his decision" (internal quotation removed)).

Upon remand, an adequate analysis of whether Plaintiff used skills applicable to her previous employment requires the Plan to undertake a detailed examination of Plaintiff's duties at both jobs and the skill set she has used and now uses. *See Smith v. CMTA-IAM Pension Tr.*, 654 F.2d 650, 659 (9th Cir. 1981).

The Plan's requirement that Plaintiff be "utilizing skills applicable to [her] previous employment" mirrors the requirement included in 29 CFR 2530.203-3(c)(2) – which is also

incorporated into the Plan – that an employee may not receive a pension when, among other requirements, she is working "in a trade or craft in which the employee was employed at any time under the plan." *Id.* Other courts and the Department of Labor ("DOL") have opined on the meaning of this requirement. The DOL has interpreted the phrase "trade or craft" to mean, as relevant here: "a skill or skills, learned during a significant period of training or practice, which is applicable in occupations in some industry." 29 C.F.R. § 2530.203-3. Moreover, it has found that "the determination whether a particular job classification, job description or industrial occupation constitutes or is included in a trade or craft shall be based on the *facts* and *circumstances* of each case." (*Id.* (emphases added).) Courts have found the DOL interpretation to mean that a plan may not decide "whether a retiree worked in a 'trade or craft' based solely on the retiree's 'job classification, job description or industrial occupation' . . . [but] must consider the 'skill or skills' actually used by the retiree in his job." *Eisenrich v. Minneapolis Retail Meat Cutters & Food Handlers Pension Plan*, 574 F.3d 644, 650 (8th Cir. 2009) (finding DOL's interpretation of "trade or craft" warranted *Auer* deference); *see also Tapley v. Locals 302 & 612 of Int'l Union of Operating Eng'rs-Emp'rs Const. Indus. Ret. Plan*, 728 F.3d 1134, 1142 (9th Cir. 2013); *DeVito v. Local 553 Pension Fund*, No. 02 CIV. 4686 (RCC), 2005 WL 167590, at *7 (S.D.N.Y. Jan. 26, 2005) ("determination of whether a particular job classification constitutes a trade or craft is based on the facts and circumstances of the case").

### *b)* ***The Record Does Not Demonstrate that the Fund Provided Plaintiff with Adequate Notice.***

Plaintiff also argues that the Fund was barred from suspending her benefits in October 2016 because she did not receive prior notice of the suspension, which both the Plan and ERISA require. The Fund claims that it twice sent letters to Plaintiff notifying her of the suspension; Plaintiff says she received neither letter.

29

Both of these letters are included in the administrative record. They were sent to the same address at which Plaintiff received subsequent letters from the Fund. Nevertheless, there is no *proof* that the letters were actually sent to Plaintiff, let alone by personal delivery or first-class mail, as required by the Plan and by ERISA. (Admin Record at 49, 91.)

Moreover, in their brief Defendants wrote, "On September 2, 2016, the Fund sent [Plaintiff] a letter informing her that she was working more than 40 hours per month and suspended her pension. Although [Plaintiff] entered Disqualifying Employment as of January 1, 2016, *the Fund's [sic] did not discover this fact until October 2016*, so the suspension took effect the month of October 2016." (Defs.' Br. at 10–11 (emphasis added).) This makes no sense. How could a letter be sent in September if the Fund did not know that Plaintiff had entered disqualifying employment until October? This fact leads the Court to question whether the letters – or at least the September letter – were ever sent.

Finally, even if the Plan had established that the letters were actually sent, it did not comport with the requirements of law, in that the letters did not notify Plaintiff about her right to a review of the suspension of her benefits, which violates both the Plan and ERISA.

### 3.   Schedule for Remand

Plaintiff has 30 days from the date of this order to submit any additional evidence she would like the Fund to consider in making its suspension decision. *See Magee v. Metro. Life Ins. Co.*, 632 F. Supp. 2d 308, 322 (S.D.N.Y. 2009) (affording plaintiff opportunity to supplement the file with additional evidence to insure effective review). The Fund then has 30 days to review this information – and any additional information it obtains on its own – and make its decision.

If the Fund determines that Plaintiff's pension should be suspended, it must also address the issue of when Plaintiff first received adequate notice of the suspension. The Fund should obtain proof that the letters were actually sent to Plaintiff and provide adequate documentation

30

supporting its finding. Plaintiff is owed benefits up and until the Fund can establish that it

provided notification pursuant to the requirements of the Plan and 29 C.F.R. § 2530.203-3(b)(4).

Finally, the Fund should also consider whether Plaintiff is still working at least 40 hours

per week at PAGNY and whether that impacts any determination of when Plaintiff's benefits

should have restarted.

The Parties are directed to report the status of the remand to this Court 60 and 120 days

after the date of this order.

### E.     Calculation of Plaintiff's Average Final Pay

Plaintiff next argues that the Fund acted arbitrarily and capriciously in calculating her

FAP. At issue are the values that the Fund was using to determine Plaintiff's "Regular Pay,"

which were then averaged to determine her "Average Final Pay."

Section 1.29 of the Plan describes "Regular Pay." It says:

> "Regular Pay" means for each Participant, his total pay in a Plan
> Year . . . during periods for which his Contributing Employer is
> required to make Contributions, *excluding overtime, on-call pay,*
> *commissions, bonuses and gratuities and expense allowances*, . . .
> For periods for which the Fund office is *unable to obtain actual pay*
> *information*, Regular Pay shall be calculated utilizing industry
> standards through a methodology approved by the Retirement
> Committee . . .

(Plan § 1.29 at 137 (emphases added).)

The Fund has calculated Plaintiff's regular pay for 2009–2013 – the five consecutive Plan

years she earned the highest regular pay out of the last ten plan years she worked in a Covered

Job Category – using industry standards, but Plaintiff claims that the Fund has or should have

access to her "actual pay" information, and that it should have used that pay instead of industry

standards.

31

## 1. The Retirement Committee's Decision was Arbitrary and Capricious

The Retirement Committee's decision was arbitrary and capricious.

The first reason that the decision was arbitrary and capricious is that the administrative record does not establish that the Fund was "unable to obtain actual pay information," such that reliance on industry standards was permissible.

If the administrative record is underdeveloped, plan administrators have some obligation to develop it further. A "reasonable effort" is required, *Cohen v. Liberty Mut. Grp. Inc.*, No. 16-CV-9295 (VSB), 2019 WL 1437615, at *12 (S.D.N.Y. Mar. 31, 2019); "'[t]he rule is one of reason,'" and "'[n]othing . . . requires plan administrators to scour the countryside in search of evidence to bolster a petitioner's case,'" *Roganti v. Metro. Life Ins. Co.*, 786 F.3d 201, 213 (2d Cir. 2015) (quoting *Harrison v. Wells Fargo Bank, N.A.*, 773 F.3d 15, 22 (4th Cir. 2014)).

The Fund represented to Plaintiff and to the Court that it made a reasonable effort to reach out to Corizon to obtain the wage records it needed to determine regular pay. But nothing in the administrative record supports this statement. The only evidence in the record that the Fund ever communicated with Corizon is a statement in a November 20, 2017 letter from Kaiser to Plaintiff's counsel, stating that the Fund had reached out to and finally "did receive wage information from Corizon," but that this information would not affect its decision because Corizon had not indicated whether overtime was included in the wages provided. (Admin Record at 87.) The Fund does not explain why it did not in the first instance ask for the exact information it needed. There is no document in the administrative record describing the Fund's processes and procedures for reaching out to Corizon, and the documentation that Corizon sent to the Fund is also not included.

The letter also said that "The Fund has followed-up, but has not received Regular Wages from [Corizon]." (*Id.*) However, there is no evidence in the record of any follow-up with

Corizon; in particular, there is no evidence that the Fund asked Corizon whether the wage information it had provided included overtime or other excludable wages. There is also no evidence of the Fund taking any other steps to secure the needed information, such as by reaching out to the Union to confirm whether Plaintiff would have even been eligible for overtime or securing additional useful information from Plaintiff.

The Fund argues that the Court should consider documents attached to the Kaiser affidavit, which includes the document Corizon sent to the Fund, because it shows that Corizon included overtime in its calculation of Plaintiff's wages, both when reporting them to the Fund and in Plaintiff's pay stub. (Defs.' Reply to Pl.'s Opp. to Defs.' Mot. for Summ. J. in favor of Defs., Dkt. No. 35, at 5.) But these documents are not part of the administrative record that the Retirement Committee used in making its determination of Plaintiff's appeal. Defendants (who take the position that evidence outside of the record should not be considered) cannot have it both ways. If this information was material, it should have been part of the administrative record given to the Retirement Committee, which then could have determined whether or not "reasonable efforts" were undertaken. The Court will not consider additional evidence, particularly when Defendants have made no argument as to why there is "good cause" to do so.

Moreover, even if the Court were to examine these documents, they would not necessarily be helpful to Defendants. The Fund's form asked Corizon to list "Total accumulated yearly salary excluding overtime, on call pay, commissions, and gratuities." (Decl. of Michael Kaiser, Dkt. No. 25, Ex. 2 at 7.) The Corizon representative then listed a number for 2010-2014. Next to each number are two boxes: one says, "OT included YES" and one says "NO." (*Id.*) The Corizon representative did not check either box, so no reasonable trier of fact could assume that the figures Corizon provided included overtime. In fact, as the question specifically states

that overtime not be included, the logical assumption would be that these figures do *not* include overtime payments. (*Id.* at 5.)

Finally, the evidence that *is* in the record does not support Defendants' argument that it actively reached out to Corizon. Defendants argue that, because Corizon – which was in legal trouble – lost its contract with the Department of Corrections in 2015 and ceased to be a contributing member of the Fund, it is "not unsurprising that Corizon refuses not [sic] to communicate with or provide information to the Fund." (Mem. of Law in Opp. to Pl.'s Mot. for Summ. J. ("Defs.' Opp."), Dkt. No. 33, at 4–5.) It argues that efforts to obtain information from Corizon were, as a result, futile.

But the Fund received information from Corizon in 2017, long *after* Corizon's contract was terminated. This undermines its futility argument. The fact that the Fund was able to communicate with Corizon to obtain some information about Plaintiff's pay leads the Court to believe that there is a genuine issue of fact as to whether Defendants are exaggerating how difficult it would have been to obtain the additional information they claim they needed. (*See* Admin Record at 87.)

Assuming arguendo that the Fund did not act in an arbitrary and capricious manner in refusing to use the Corizon data, there is still a problem, because it is not clear from the administrative record whether the Fund used industry standard information to calculate Plaintiff's FAP rather than data it obtained from "Richmond University Medical Center," which never employed Plaintiff. The Fund now claims that its reference to "Richmond University," was a "typo" and that Plaintiff's FAP was calculated using an industry standard. (Defs.' Opp. at 4.) But that explanation does not appear in the administrative record. The Fund never told Plaintiff that there was a "typo" relating to "Richmond University" and never provided a

recalculation demonstrating that it had actually applied industry standards, rather than information that it received from the wrong entity. There is nothing in the administrative record from which the Committee or the Court could verify that the figures applied to calculate Plaintiff's FAP were actually those derived from the Industry Standard.

Because the administrative record does not establish that the Fund was "unable to obtain actual pay information," such that it could rely on industry standards under the Plan, nor has the Fund provided a record demonstrating that its calculations based on industry standards are accurate, I find that the Retirement Committee's decision was arbitrary and capricious. This claim, too, is remanded to the Trustees, for a "full and fair" review.

### 2. Schedule for Remand

The Fund should take, and record for the administrative record, "reasonable efforts" to obtain necessary information from Corizon or the Union, including by attempting to contact Corizon by letter and by telephone within 14 days of this opinion. Plaintiff may also provide the Fund with any additional information she is able to obtain on her own within 30 days of this order. The Fund should provide Plaintiff with an update within 60 days of initiating contact with Corizon or the Union, that includes any new information the Fund learned as well as documentation of the efforts it took to reach out to obtain the missing information and any responses it did (or did not) receive.

If the Fund is able to obtain the relevant information within 60 days of attempting contact with Corizon, it should use that actual pay data to recalculate Plaintiff's FAP and, if that shows underpayment of benefits, reimburse Plaintiff accordingly. If the Fund is still unable to obtain sufficient information about Plaintiff's actual pay within 60 days, it may use the "industry standard" to calculate Plaintiff's FAP – but it must send Plaintiff a detailed description of what "industry standards" were used and how the FAP was calculated.

35

Plaintiff has also raised the issue that the Fund acted arbitrarily and capriciously by failing to recalculate Plaintiff's benefits to account for the shift deferential, as it said that it would when resolving its appeal. Defendants argue that the Court should not address this claim now, given that Plaintiff has not exhausted her administrative remedy. Defendants are correct – Plaintiff should, by letter, request that the Fund follow-up on its decision and, if necessary, proceed through the appeal process as outlined by the Plan.

The Parties are directed to report the status of the remand to this Court 60 and 120 days after the date of this order.

### F.  Plaintiff's Future Service Credit for Her Work at St. Barnabas

Plaintiff's third claim is that the Fund acted arbitrarily and capriciously by denying her *future* service credit for her work at St. Barnabas.

For her work at St. Barnabas, Plaintiff was awarded past service credit, which is calculated using a lower multiplier than credited future service. Initially, Plaintiff did not dispute the Fund's finding that she was entitled to past service credit for her work with St. Barnabas, which joined the fund in 2001. However, Plaintiff now argues that, in an August 3, 2017 letter to Plaintiff, the Fund indicated that Plaintiff "joined the Fund when she worked a St. Barnabas from 1998 to 2001," and, therefore, she should be receiving credited future – not past – service for this time. (Baum Decl. Ex. J at 1.)

#### 1.  The Retirement Committee's Decision was Not Arbitrary and Capricious

The Committee did not act arbitrarily and capriciously in interpreting the Plan and the facts as it did. Indeed, the letter cited by Plaintiff does not support her argument.

The letter to which Plaintiff refers says the following:

> Ms. Brightman joined the Fund when she worked at St. Barnabas
> from 1998 to 2001. Physicians Assistants from St. Barnabas joined

> the Fund in 2001 and Ms. Brightman received Credited Past Service
> from 1998 to 2001 for her St. Barnabas employment. In this case,
> Ms. Brightman received the proper Credited Past Service for her
> employment at St. Barnabas . . .

(*Id.* at 1–2.) The Fund never said that Plaintiff was in the Fund the entire time that she was at St.

Barnabas; it said that she became enrolled in the Fund during the period when she was working

for St. Barnabas (from 1998 to 2001) and then quite specifically says that she joined in 2001,

along with the other PAs.

At the August 23, 2017 hearing, the Trustees nevertheless agreed to review the St.

Barnabas CBA to confirm their understanding of when the PAs became covered. (Admin

Record at 105.) However, in the November 20, 2017 letter, the Fund indicated that it did "not

have, and could not obtain, a copy of the St. Barnabas Collective Bargaining Agreements from

more than a decade ago, but the Fund recorded the effective date [for PAs] contemporaneously

with the event." (*Id.* at 86.)

The fact that the Trustees could not access the CBA to confirm their records is not

enough for me to find that they acted arbitrarily and capriciously by holding that Plaintiff should

receive past service credit for her work at St. Barnabas from 1998 until January 2001, especially

when the Fund asserts that its contemporaneous records show the applicable date as January

2001. Plaintiff has provided no evidence to contradict the Trustee's reliance on its own record of

the effective date (which she originally did not dispute). The Fund's own records offer a

perfectly reasonable basis for its decision. *See Wedge v. Shawmut Design & Const. Grp. Long

Term Disability Ins. Plan*, 23 F. Supp. 3d 320, 334 (S.D.N.Y. 2014) (plan's decision "must be

upheld unless it is not grounded on *any* reasonable basis" (internal quotation removed)).

Accordingly, Defendants are entitled to summary judgment on this claim.

### G.    Plaintiff's Past Service Credit for Work Performed With St. Vincent's

Finally, Plaintiff argues that she should be credited for past service performed for the period from 1993 to 1997, when she worked as a PA for St. Vincent's.

Plaintiff does not dispute that when she worked for St. Vincent's, it was not contributing to the Fund on behalf of PAs. (Admin Record at 53.) She asserts that credit for pre-1998 work at Rikers Island was promised to PAs who were working for St. Barnabas by Union organizer Mark Bergen, and that this promise should be enforced. She explains that Bergen's promise was the reason that she joined the Union and began participating in the Fund. (Pl.'s Br. at 21.)

#### 1.    The Retirement Committee's Decision was Not Arbitrary and Capricious

Again the Trustees decision to deny Plaintiff's claim was not arbitrary and capricious

Plaintiff relies on *Pasqualini v. Sheet Metal Workers' National Pension Fund,* 54 F. Supp. 2d 357 (S.D.N.Y. 1999) to support her argument that a pension fund may be bound by promises made during a union representative during an organizing campaign. In *Pasqualini,* my colleague, Judge Kaplan, recognized that, in the Second Circuit, "under 'extraordinary circumstances' principles of estoppel can apply in ERISA cases. The controlling questions . . . are (1) whether plaintiffs have made out a case of estoppel and, if so, (2) whether the circumstances are sufficiently extraordinary to permit invocation of that estoppel against the plan notwithstanding the strong statutory policies cutting against such a result." *Pasqualini,* 54 F. Supp. 2d at 362. Judge Kaplan found that both of these requirements were satisfied when a Fund representative had convinced the principals of a company to execute a collective bargaining unit with the union by orally promising that they would get 15 years of past service credit under the pension plan. He found that the plaintiffs were "working people," whose reliance on "flat, unequivocal statements" of union representatives was "entirely reasonable." *Id.* at 363. He

explained that to "hold otherwise would be to ignore the reality that lay people simply do not approach business transactions as their more educated offspring are taught to approach them at our nation's law schools." *Id.* Judge Kaplan also found that there were "extraordinary circumstance" because of the "pivotal role" the promise had in inducing the owners to join the union, "the *quid pro quo* for which [plaintiffs] bargained in agreeing to the CBA, with its requirement of making benefit plan contributions to the Fund," and the fact that the fulfillment of this promise would have minimal impact on the fund. *Id.*

But there is one key difference between the facts of *Pasqualini* and the facts here. In *Pasqualini*, the Fund was bound to uphold a promise that was made by a "representative of the Fund," not a representative of the Union. Here, Plaintiff alleges that Mark Bergen was a "Union Organizer," but do not claim that he represents the Fund. Plaintiff has cited to no case that says that a promise by a Union organizer – not a Fund representative – can bind the Fund. Nor does she offer any evidence that a Union organizer can bind the Fund.

Moreover, even if Plaintiff could bring an estoppel claim, she has not satisfied the requirement of "extraordinary circumstances."

Plaintiff's submissions to the Fund were sufficient to make out a claim of estoppel. In multiple letters to the Fund, Plaintiff explained that when the Rikers PAs were being organized, they were "given assurance by Union organizer Mark Bergen that if they joined the Union at its inception, [they] would be granted past service credit for time at Rikers Island and the 'Tombs.'" (Admin Record at 40.) This would mean that Plaintiff's time with St. Vincent's would be covered as past service credit. Plaintiff also provided the Fund with the names of six individuals who she believes are being credited for past service as PAs at Rikers during the time she was at St. Vincent's. (*Id.* at 7.) This testimony is enough to support an estoppel claim – Plaintiff, a

39

"working person," reasonably relied on a promise by the Union representative when agreeing to join that Union.

Nevertheless, Plaintiff's estoppel claim fails because she has not raised a genuine issue of material fact that Bergen's promise could constitute "extraordinary circumstances." *See Pasqualini*, 54 F. Supp. 2d at 363. Extraordinary circumstances exist when a representative makes a promise to *induce* action, and later reneges on that promise. *See Aramony v. United Way Replacement Benefit Plan*, 191 F.3d 140, 152 (2d Cir. 1999); *Berg v. Empire Blue Cross & Blue Shield*, 105 F. Supp. 2d 121, 130 (E.D.N.Y. 2000) (inducement can serve as basis for "extraordinary circumstances"); *Herter v. Dick's Clothing & Sporting Goods, Inc.*, 58 F. Supp. 2d 306, 312 (S.D.N.Y. 1999). But plain reliance, does "not by itself render [a] case 'extraordinary.'" *Devlin v. Transportation Commc'ns Int'l Union*, 173 F.3d 94, 102 (2d Cir. 1999).

Plaintiff claims that she was made a promise by Bergen and that she relied on that promise, but she never says that this promise *induced* her to join the Union. And there is no evidence in the record that this promise was essential to her decision to join the Union or to convince other PAs to do the same. Since Plaintiff failed to provide any evidence of inducement, she has not raised a genuine issue of material fact as to whether there were "extraordinary circumstances."

Accordingly, I cannot find that the Fund acted arbitrarily and capriciously by relying on the terms of the contract alone to deny Plaintiff's demand for past service credit for her time at St. Vincent's. Summary judgment is granted for the Defendants on this claim.

## III. Conclusion

For the reasons stated above, Plaintiff's Motion for Summary Judgment is denied and Defendants' Motion for Summary Judgment is granted in part and denied in part. The case is remanded to the Fund for reconsideration in light of this opinion.

The Clerk of Court is respectfully directed to close Dkt. Nos. 19 and 24. This constitutes the decision and order of the Court.

Dated: July $\underline{10}$, 2019

Chief Judge

BY ECF TO ALL PARTIES

41