UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
VICTORIA I. BRIGHTMAN,

                       Plaintiff,

       -v-

1199SEIU HEALTH CARE EMPLOYEES PENSION
FUND and 1199SEIU RETIREMENT COMMITTEE,

                Defendants.

------------------------------------------------------------------X

:
:
:
:
:
:
:
:
:
:
:
:
:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__3/2/2021__

18-cv-4932 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

      Victoria Brightman ("Brightman" or "Plaintiff") moves for summary judgment for a

second time.  Defendants 1199SEIU Health Care Employees Pension Fund (the "Fund" or the

"Plan") and 1199SEIU Retirement Committee (the "Retirement Committee" or the

"Committee") (collectively "Defendants") have made a cross motion for summary judgment in

their favor.  For the following reasons, Brightman's motion is DENIED and Defendants' motion

is GRANTED.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Plaintiff's Career

      Brightman was employed as a physician's assistant ("PA") on Riker's Island from 1993

to 2014.  During this period, she was employed through several different hospitals that

contracted with New York City to provide medical services on Rikers Island.  Dkt. No. 23 ¶ 1.

From 1993 to 1994, Brightman was employed by Bronx Lebanon Hospital.  *Id*. ¶ 2.  From 1993

to 1997, Brightman was employed by St. Vincent's Medical Center.  *Id*. ¶ 3.

From 1998 until 2000, Brightman was employed by St. Barnabas Hospital.  Dkt. No. 58 ¶ 4.  From 2001 to 2014, she was employed through Corizon Health ("Corizon") after Corizon took over the contract for the provision of health care services at Rikers Island.  *Id.*

B.       The 1199 SEIU Health Care Employees Pension Fund

During the period of her employment with Corizon, Brightman participated in the 1199SEIU Health Care Employees Pension Fund, an employee pension benefit program governed by the Employee Retirement Income Security Act ("ERISA").  The Fund is a multi-employer trust funded with contributions from Contributing Employers pursuant to various collective bargaining agreements between 1199SEIU United Health Care Workers East members and healthcare employees.  Dkt. No. 59 at 3.  Plaintiff's claims concern the Fund's calculation of benefits and notice of suspension of benefits.  The provisions of the Plan relevant here are as follows:

1.       Calculation of Benefits

Under the Plan, pension benefits are calculated according to the following formula: one-twelfth of 1.85% of Average Final Pay ("AFP"),[1] multiplied by Credited Future Service, plus 1.5% of Past Service Pay multiplied by Credited Past Service.  Dkt. No. 21, Ex. Q § 5.2(b).

"'Average Final Pay' means for each Participant, the highest average Regular Pay during five (5) consecutive Plan Years of employment after his Applicable Effective Date and within his last ten (10) Plan Years of Credited Future Service."  *Id.* § 1.6.

"'Regular Pay' means for each Participant, his total pay in a Plan Year . . . during periods for which his Contributing Employer is required to make Contributions, excluding overtime, on-

---

[1] The parties in their briefing, as well as the Committee on remand, sometimes use the term Final Average Pay ("FAP") for the same concept.  The Court will use "AFP," as do the terms of the Plan.

call pay, commissions, bonuses and gratuities, and expense allowances." *Id*. § 1.29. "For periods for which the Fund office is unable to obtain actual pay information, Regular Pay shall be calculated utilizing industry standards through a methodology approved by the Retirement Committee." *Id*.

"Credited Future Service . . . means, for each Participant, his total service on and after his Applicable Effective Date, credited at the rate of one (1) month for each month for which Contributions are required to be made to the Fund by reason of the Participant's employment." *Id*. § 3.2(a). "Credited Past Service . . . means for each Participant his total service prior to his Applicable Effective Date with all Contributing Employers." *Id*. § 3.2(b). "'Applicable Effective Date' means, for each Participant, the date a Contributing Employer became obligated to make Contributions to the Trust Fund for members of the bargaining unit in which the Participant was employed when he first became a Participant." *Id*. § 1.2.

2.    Disqualifying Employment and Suspension of Benefits

Under the terms of the Plan, after a Participant begins receiving pension benefits, she may continue to receive them if she becomes "actively employed," with the following exception:

> [N]o pension benefit payment shall be made or continue to be made to a Pensioner who is actively employed in full or part-time employment for more than 40 hours per month:
>
> > (a) in the healthcare or human service industry or a related industry (including, but not limited to, hospitals, nursing and convalescent homes, drugstores, laboratories, medical schools, and universities), and
> >
> > (b) utilizing skills applicable to his previous employment in the healthcare or human service or related industry, and
> >
> > (c) in an Area covered by the Plan and within the meaning of "Section 202(a)(3)(B) Service" pursuant to Department of Labor Regulations 29 C.F.R. § 2530.203-3(c)(2).

*Id.* § 11.7.  Such employment is termed "Disqualifying Employment."  The Plan is entitled to suspend the benefits of any Plan Participant who engages in Disqualifying Employment.  Once a Participant's benefits have been suspended, she will receive no further benefits until she reapplies to the Fund for her pension benefits.

If the Plan intends to suspend a Participant's benefits for engaging in Disqualifying Employment, the Plan is required to provide notice:

> A Pensioner whose benefits are suspended as described above and a Participant who continues to work for a Contributing Employer beyond Normal Retirement Date shall receive (to the extent required under ERISA) a notice that includes the information and complies with Department of Labor Regulations 29 C.F.R. § 2530.203-3(b)(4).  Such notice shall be delivered by first class mail or personal delivery not later than the end of the first calendar month during which benefit payments are suspended.

*Id.*  The cited regulations, in turn, state what should be included in the suspension notice:

> Such notification shall contain a description of the specific reasons why benefit payments are being suspended, a general description of the plan provisions relating to the suspension of payments, a copy of such provisions, and a statement to the effect that applicable Department of Labor regulations may be found in § 2530.203-3 of the Code of Federal Regulations.  In addition, the suspension notification shall inform the employee of the plan's procedure for affording a review of the suspension of benefits.

29 C.F.R. § 2530.203-3(b)(4).

In order to regain pension benefits after a suspension, a Participant must reapply to the Fund.

### 3.    Appeal Rights

The Plan grants the Plan Administrator and Trustees discretionary authority to interpret the Plan and related Plan documents:

> Notwithstanding any other provision in the Plan and to the full extent permitted by ERISA and the Internal Revenue Code, the Plan Administrator shall have the exclusive right, power and authority, in its sole and absolute discretion:

> To administer, apply, construe and interpret the Plan and any related Plan documents
>
> To decide all matters arising in connection with entitlement to benefits, the nature, type, form, amount and duration of benefits, and the operation or administration of the Plan; and
>
> To make all factual determinations required to administer, apply, construe and interpret the Plan (and all related Plan documents).

Dkt. No. 21, Ex. Q § IX.G

If a Participant's claim is denied or the Participant believes that her pension amount is not correct, she has the right under the Plan to appeal to the Retirement Committee. Id. § IX.B. In order to appeal, a Participant must file a written request with the Plan Administrator no later than 60 days after receiving notice of adverse benefit determination. *Id.* The Plan requires that the "decision of the Retirement Committee will be made in writing and will include an explanation of the decision and the specific reference to any Plan provisions on which the decision is based." *Id.* The decisions of the Committee are "final, binding, and conclusive on all parties," subject only to the Participant's right under ERISA to sue in federal court. *Id.*

C.   Plaintiff's Disability and Pension Payments from November 2014 to October 2016

Brightman left Corizon on May 5, 2014 after becoming physically disabled. Dkt. No. 23 ¶ 14. Her disability required her to use a wheelchair. *Id.* Due to her disability, Brightman was unable to work at all from May 5, 2014 to May 16, 2016. *Id.* ¶ 15.

Around March 1, 2015, the Fund sent Brightman an "approaching 65 letter." Dkt. No. 60-6 ¶ 6. The letter contained information for employees who continue to work beyond normal retirement age ("NRA"). *Id.* It informed Plan Participants who continued to work past 65 that they would not receive their benefits until they retired, and that the Plan would suspend the

benefits of a Plan beneficiary who returned to work in the same field after beginning to receive pension benefits.  *Id*.  The letter also stated: "If after you start to collect your pension and choose to return to Covered Employment or Disqualifying Employment, you must notify the Pension Fund with [sic] 30 days of the start date of your employment."  *Id.*

Brightman turned 65, thus attaining NRA, on April 1, 2015.  *Id*.  In November 2015, Brightman applied for her pension and for disability benefits.  She requested benefits retroactively to May 2014, the date she had stopped working at Corizon.  Dkt. No. 23 ¶ 17.  Under the terms of the Plan, Plaintiff's eligibility for disability pension benefits began on the effective date of her Social Security disability payments, which was November 2014.  Dkt. No. 50 at 298.  She was paid a disability pension for the period from December 2014 to April 2015, and a retroactive NRA pension from April through December 2015.  Dkt. No. 60-6 ¶ 7.  The Fund sent her another letter in December 2015 which included additional information about the pension and repeated the admonition to contact the Fund if she resumed work.  *Id*.

D.      Plaintiff Returns to Employment and Termination of Benefits

While collecting her pension, around May 2016 Brightman returned to work with her same job title of Physician Assistant at the Manhattan House of Detention, through the current healthcare provider and Contributing Employer, Physician Affiliate Group of New York ("PAGNY").  Dkt. No. 60-6 ¶ 10.  Brightman did not inform the Fund that she had returned to work.  *Id*.

In September 2016, after learning of Brightman's employment with PAGNY through PAGNY's contribution reports and determining that her employment constituted Disqualifying Employment under the Plan's terms, the Fund sent her a "40 hour" warning letter, informing her that her benefits would soon be suspended because she had resumed work.  *Id*. at 130.  Around

6

September 24, 2016, the Fund sent Plaintiff a copy of the Plan and the Plan's Summary Plan Description ("SPD").  *Id*.   In October 2016, the Fund sent Brightman a letter notifying her that her benefits were suspended as of October 31, 2016, because she had continued to work.  *Id*. at 132-33.  The letter directed her to call the Retirement Center if she wished to challenge the Fund's determination.  *Id*. at 133.

Plaintiff only worked intermittently for PAGNY due to physical problems resulting from her injury.  Plaintiff did not work at all from December 2017 to June 2018.  Afterwards, she worked intermittently until she was terminated in August 2019 while on medical leave under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*  Dkt. No. 53-1. at ¶ 10-11.

E.      Brightman's Challenge

In February 2016, soon after beginning to receive her benefits, Brightman questioned the Fund's calculation of her monthly pension benefit, which was initially set at $1,861.00.  She formally appealed the calculation pursuant to the Plan's administrative procedures in August 2016, disputing the Fund's determination of her past and future service credits (specifically, she argued that she should get past service credits for her St. Vincent's employment from 1993 to 1997 and that her St. Barnabas employment should be future credited service, rather than past service credits).  *Id*. at 287-290.  She did not dispute the Fund's estimates of her annual pay.  The Fund upheld its determination in a letter dated April 25, 2016, which included a description of how to appeal the denial to the Retirement Committee.  *Id*. at 283-86.

Sometime after April 2016, Brightman retained counsel to represent her in the dispute. Brightman's counsel requested information from the Fund about the Industry Standard method the Fund used to calculate base pay for years in which that information was not available for a particular Participant.  The Fund responded that its method was to take the wage rate for a year

7

the Fund had a record of the Participant's actual pay, and then to back out or add the annual

increases in the Industry/League CBA.  In accordance with this method, the Fund had used the

wage rate on the lone paystub Brightman had submitted with her pension application, which was

for the year 2013.  Brightman contended that the Fund should use information from Brightman's

W-2s to establish her actual pay; the Fund responded that W-2s cannot be used to calculate

Regular Pay, because they do not separate out overtime wages, which are not included in the

calculation of Regular Pay.  Dkt. No. 59 at 6.

On February 2, 2017, Plaintiff's counsel sent a letter to the Fund, demanding that the

Fund lift the suspension of Plaintiff's benefits, pay her benefits for the months of November

through February 2017, and continue to pay her benefits thereafter.  Dkt. No. 50 at 60-62.  The

letter also demanded that (1) Plaintiff be credited with service for her employment with St.

Vincent's from 1993 to 1997; and that (2) the Fund recalculate Brightman's AFP using

information obtained from Corizon, the Social Security Administration, and Plaintiff's own

records.

On April 6, 2017, the Fund attempted to get Brightman's pay information from Corizon.

Corizon returned an income verification questionnaire with Brightman's annual wages, but it did

not make clear whether the amount included overtime wages or not.  Dkt. No. 59 at 6-7.

However, because the amount Corizon reported for the year 2013 matched the amount on

Plaintiff's 2013 paystub including overtime, the Fund suspected that the wages reported by

Corizon were also inclusive of overtime.  Because it could not get any additional information

from Corizon, the Fund continued to use the Industry Standard calculation for all years of

Brightman's employment excepting 2013.  Dkt. No. 59 at 7.

On April 19, 2017, the Fund responded to Plaintiff's counsel.  The Fund denied all of Brightman's demands, explaining that: (1) Plaintiff's work with PAGNY for more than forty hours per month disqualified her from receiving any pension benefits, starting when she was employed with PAGNY; (2) the Fund had sent Plaintiff a suspension notice warning letter explaining this rule on September 2, 2016, as well as a notice of suspension in October 2016; (3) Plaintiff received disability benefits through November 2014 and, therefore, was not eligible for Pension benefits during that period; (4) Plaintiff's employment from 1993-1997 could not be credited because during that time she was under the St. Vincent's contract, and past service credit was not awarded until St. Barnabas took over the contract, which occurred on January 1, 1998; (5) the Fund had reached out to Corizon to verify the earnings numbers that Plaintiff provided because it wanted to ensure that these numbers did not include overtime, but also asked that Plaintiff provide documentation for her earnings during this periods; (6) the Fund had used Plaintiff's weekly salary and industry standard wages to calculate her AFP; and (7) industry standard wage had also been used to determine her wage on the applicable Effective Date (January 1, 2001), which was then adjusted to establish her base pay for purposes of calculating her past service pay.

On June 15, 2017, Plaintiff appealed the Fund's decision to the Retirement Committee. In her notice of appeal, Plaintiff repeated all of her prior demands.  Plaintiff claimed that she never received the "forty hour letter" suspending her benefits.  After pointing out that the Fund was required to maintain accurate records of a Participant's pay pursuant to ERISA, she insisted that the Fund, not she, should bear the responsibility of obtaining the actual number of Plaintiff's pay from Corizon, or else should use the base pay Plaintiff had provided.  *Id.* at 6-7.  Providing her W-2 forms, Plaintiff claimed that her AFP should have been calculated at a higher rate.

Michael Kaiser ("Kaiser"), the Chief Pension Officer of the Fund, responded on August 3, 2017.  Dkt. No. 21, Ex. J.  The letter confirmed that the Fund still found Plaintiff ineligible for collection of benefits as of November 1, 2016.  It also asserted that her AFP had been calculated correctly based on the information available to the Fund; her time with St. Vincent's could not be included in the past service calculation; and her disability benefits commenced on the appropriate date.  *Id*.  Attached to this letter were copies of the two letters the Fund claims to have sent to Plaintiff on September 2, 2016 and October 3, 2016, informing Plaintiff that her benefits had been suspended.  Dkt. No. 23 ¶ 60.

On November 21, 2017, the Retirement Committee upheld the Fund's use of the Industry Standard calculation, but granted another of Brightman's arguments (not relevant here), which brought her monthly pension benefit to $1,945.80.  The Committee also upheld the suspension of Plaintiff's benefits.

### F.      Brightman's Suit

After receiving the decision of the Retirement Committee, Brightman sued in federal court, challenging four aspects of the Committee's decision.  First, she challenged the Committee's denial of future service credit for her work at St. Barnabas.  Second, she argued that she should be entitled to past service credit for the time she worked at St. Vincent's.  Third, she argued that the Fund improperly suspended her benefits in October 2016.  Finally, she argued that the Fund had improperly calculated her AFP in making its determination about the benefit she was entitled to.

The parties cross-moved for summary judgment.  The Court, per Chief Judge McMahon, granted summary judgment in favor of Defendants on the first two claims.  Dkt. No. 40. However, the Court concluded that the Fund's decision was arbitrary and capricious with respect

to the latter two claims.  As for the benefit suspension, the Court concluded that the Retirement

Committee had failed to consider two issues: First, the Committee had not compared Plaintiff's

job requirements at Corizon and PAGNY to see if they were similar, as the Plan provided that

suspension of benefits was appropriate only where a Participant's new job used skills applicable

to her previous employment.  Brightman had argued that her new position with PAGNY required

fewer skills than her previous position with Corizon.  Second, the Committee had failed to

establish that it had given Brightman the required notice of the suspension of benefits, as the

record did not contain evidence reflecting that Brightman had received the notice and the notice

itself did not explain Plaintiff's right to a review of the suspension of her benefits as required by

ERISA's implementing regulations and the terms of the Plan.  Dkt. No. 40 at 30.  The Court

directed the Fund to determine whether Brightman's benefits were properly suspended, and, if it

determined that they were, to consider whether Brightman was still working at least 40 hours per

month in Disqualifying Employment and whether this impacted a determination of when her

benefits should have restarted.  With respect to Brightman's AFP, the Court found that the Fund

had not made sufficient efforts to obtain actual pay information from Corizon.  There was no

record that the Fund had followed up with Corizon to ascertain whether the pay information it

had received was inclusive of overtime or not, nor of any effort to get information regarding

Brightman's regular pay after the initial inquiry.  *Id.* at 32-33.  The Fund was obligated to make

more proactive efforts to get the information from Corizon.

 The Court remanded the case to the Fund for further consideration of these two issues.

 G.  Proceedings on Remand

 Prior to the Retirement Committee's meeting to review her case, Brightman submitted

additional documentation to the Fund.  The documentation showed that Brightman had not

worked during 2017, and in 2018 had worked more than 40 hours only in the month of July. Dkt. No. 53-11 at 9-10.

The Committee met on September 24, 2019 to evaluate the issues remanded by the Court. Dkt. No. 50 at 1. The Committee "pended" the appeal in order for the Fund to respond to inquiries raised by Brightman's counsel in the meeting and in a letter submitted by counsel the same day. *Id*. On October 15, 2019, the Fund provided Brightman's counsel with additional information, and offered counsel the opportunity to respond. *Id*. On November 20, 2019, the Committee met again, "reviewed the entire administrative record, the suspension of Ms. Brightman's benefits, the amount of her 'Final Average Pay,'" and the calculations of her pension benefits. *Id*.

The Committee concluded, first, that the Fund had properly suspended Brightman's benefits on account of her work as a PA for PAGNY at the Manhattan House of Detention. *Id*. at 2. It found that "for purposes of Disqualifying Employment, the relevant inquiry was whether during her post-retirement work at PAGNY she used skills that were applicable to her pre-retirement employment." *Id*. The Committee contacted PAGNY, which informed it that Brightman's duties included performing chart reviews and summaries on all transfers, a duty which Brightman had when she was employed with Corizon, and which can only be performed by a Physician or a PA. *Id*. The Committee also noted that the PA job descriptions at Manhattan House before Brightman's retirement and after her re-employment were "virtually identical." *Id*. The Committee did not credit Brightman's claim that she was a mere "quality control reviewer" despite her PA position title and salary, finding it highly improbable that a hospital would pay a PA salary to someone performing clerical work. *Id*. at 2-3. Thus, the Committee concluded once again that Brightman performed Disqualifying Employment at PAGNY.

12

Second, the Committee decided to pay benefits to Brightman for the period up until June

15, 2017, the date that Brightman filed her appeal of the suspension decision.  *Id*. at 6.  It

concluded that by that date, Brightman unquestionably had notice of the appeals process, and

thus could not complain that the deficient notice in the suspension letters prejudiced her after that

date.  *Id*.

Nonetheless, the Committee continued to maintain that the notice letters sent in

September and October 2016 were adequate.  *Id*. at 3-4.  The Committee rejected Plaintiff's

argument that the two suspension letters and the Plan/SPD the Fund sent Brightman in

September and October 2016 did not constitute sufficient suspension notice.  *Id*. at 4.  The

Committee noted that the Fund was not required to provide all of the required elements of the

suspension notice in one single notice.  According to the Committee, "the Fund sent a

combination of notices and the Plan/SPD to Ms. Brightman at the time of her re-employment that

substantially complied with the Plan and the law."  *Id*.  The Committee additionally noted that

Brightman was already in the midst of an administrative appeal when her benefits were

suspended in October 2016, and thus was apparently already on notice about the appeals process.

*Id*.  Brightman had never claimed that she was unaware of her appeal rights at the time of the

suspension.  *Id*.

In response to the Court's concern that the Fund had failed to show that it had actually

sent the suspension notices, the Committee produced records of first-class mailing of suspension

warning letter and the suspension notice.  Dkt. No. 50, Ex. S.  The Fund additionally provided

contemporaneous records showing that it had sent a letter to PAGNY on September 2, 2016,

requesting Brightman's reemployment information and that PAGNY had provided the

information on September 15, 2016.  *Id*., Ex. 12.  Thus, although the Committee decided to pay

Plaintiff retroactive benefits for the months of October 2016 through June 2017, it continued to maintain that the original suspension was valid and that the suspension letters were compliant with ERISA.

Next, the Committee analyzed the issue of Brightman's AFP.  After the Court ordered the Committee to make "reasonable efforts" to obtain Brightman's actual pay data from Corizon, the Committee served Corizon with a subpoena.  In response, Corizon provided additional pay rate data for the years 2010-2014.  *Id*. at 5.  The Fund's Pension Department performed additional calculations using the pay rate information from 2010 on and using the Industry Standard methodology for the period prior.[2]  Using these new figures, the Pension Department concluded that Brightman's five highest-paid years were 2009-2013, during which she was paid an average of $89,111.99.  *Id*.  Based on this AFP, the Committee determined that Brightman was entitled to monthly pension benefit of $1,896.93.  This total was, in fact, lower than the total the Fund had previously calculated based on Industry Standard numbers, which had come out to a monthly benefit of $1,945.80 per month.  *Id*.

In her letter to the Committee dated September 24, 2019, Brightman argued for the first time that her five highest consecutive years of pay were 2005-2009.  *Id*.  Brightman argued that the Committee should find she was paid $81,056.92 in 2009—the amount of gross earnings on her W-2—and that she was paid $99,738.22 in each of the years from 2005-2008.  The Committee rejected these findings.  The Committee concluded that it was impossible for

---

[2] Plaintiff claims in her briefing that the Committee "compared the amounts calculated under the Wage Calculation Method with amounts previously reported by Corizon to the Fund [and] used the lesser of the two amounts as Brightman's AFP."  Dkt. No. 53-11 at 13.  This is a misleading characterization of the Fund's process.  It used the actual pay data it received for Corizon for the years it was available and used Industry Standard for years in which it was not, as stipulated by the terms of the Plan.

Brightman's Regular Pay to have been that high without exceeding the collectively bargained rate.  *Id*. at 6.  The Committee also noted again that W-2 earnings information cannot be used to establish Regular Pay, because W-2s do not separate non-pensionable overtime from base pay.  *Id*.  The Committee also noted that her position contradicted her earlier claim that she was paid $17,533.08 in 2006.  *Id*.

On the basis of these findings, the Committee recalculated Brightman's benefit to $1,896.93 per month.  It directly deposited $14,049 into her bank account to pay for the months of November 2016 through June 2017.  Dkt. No. 53-11 at 14.

F.      Plaintiff's Retirement

In December 2019, Brightman contacted the Pension Department to inform them that she had retired.  Dkt. No. 56 ¶ 14.  When the Pension Department prepared her new Pension EOB, her monthly benefit increased to $2,011.00 with the additional accrual and new years of salary during her time with PAGNY.  *Id*.

G.      Second Summary Judgment Motion

Brightman returned to this Court, challenging both the calculation of her AFP and the Committee's decision that her benefits were lawfully suspended by June 15, 2017.  On February 4, 2020, the case was reassigned to the undersigned.  Brightman filed her second motion for summary judgment on June 1, 2020.  Dkt. No. 53.  Defendants filed a cross-motion for summary judgment and a motion in opposition to Plaintiff's motion for summary judgment on July 6, 2020.  Dkt. No. 55.  Plaintiff filed her reply on July 13, 2020, Dkt. No. 60, and Defendants filed their reply on July 20, 2020.  Dkt. No. 62.

**LEGAL STANDARD**

Summary judgment is appropriate when the record shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party," *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008), and the movant bears the burden of demonstrating that "there is no genuine dispute as to any material fact," Fed. R. Civ. P. 56(a).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  It may not rely on "mere speculation or conjecture as to the true nature of the facts," *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted), or "on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible," *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).  Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record," Fed. R. Civ. P. 56(c)(1)(A), and demonstrating more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see*

*also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  If "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact," summary judgment shall be denied.  *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9-10 (2d Cir. 1983).

## DISCUSSION

A.    Standard of Review

ERISA provides that a person denied benefits under an employee benefits plan may challenge that denial in federal court.  29 U.S.C. § 1132.  "Although it is a comprehensive and reticulated statute, ERISA does not set out the appropriate standard of review for actions . . . challenging benefit eligibility determinations."  *Firestone Tire & Rubber v. Bruch*, 489 U.S. 101, 108-09 (1989) (citation and quotation marks omitted).  The parties dispute whether the Court should review the Fund's decision de novo or for an abuse of discretion.  In *Firestone Tire*, the Supreme Court held that a challenge to the denial of benefits under an ERISA-covered employee benefit plan "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," in which case an arbitrary and capricious standard applies. *Firestone*, 489 U.S. at 115.  Even where an arbitrary and capricious standard applies under the benefit plan, a court "must consider whether such deference conflicts with the 'language of the statute, its structure, or its purpose,' bearing in mind 'competing congressional purposes.'"  *Halo v. Yale Health Plan*, 819 F.3d 42, 52 (2d Cir. 2016) (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996)).  The Second Circuit has held that "a plan's otherwise discretionary denial of a claim that fails to comply with the Department of Labor's claims-procedure regulation is not entitled to deference."  *Halo*, 819 F.3d at 56.  However, "when denying a claim for benefits, a

plan's failure to comply with the Department of Labor's claims-procedure regulation will result in the claim being reviewed *de novo* in federal court, unless the plan has otherwise established procedures in full conformity with the regulation and can show that its failure to comply with the claims-procedure regulation in the processing of a particular claim was inadvertent and harmless." *Id*. at 57-58.

Where the arbitrary and capricious standard applies, a court "may not overturn the administrator's denial of benefits unless its actions are found to be arbitrary and capricious, meaning 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 132 (2d Cir. 2008) (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995)).  "Substantial evidence is 'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] . . . requires more than a scintilla but less than a preponderance.'"  *Celardo v. GNY Auto. Dealers Health & Welfare Tr.*, 318 F.3d 142, 146 (2d Cir. 2003) (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995)).  Under arbitrary and capricious review, the "scope of review is narrow."  *O'Shea v. First Manhattan Co. Thrift Plan & Tr.*, 55 F.3d 109, 112 (2d Cir. 1995).  An administrator's decision is arbitrary and capricious when it is "without reason, unsupported by substantial evidence or erroneous as a matter of law."  *McCauley*, 551 F.3d at 132 (quoting *Pagan*, 52 F.3d at 442).

There is no dispute that the Plan grants the Fund Trustees discretionary authority to interpret the Plan and documents related to the Plan.  Dkt. No. 40 at 19.  Thus, the Court "will not disturb the administrator's ultimate conclusion unless it is 'arbitrary and capricious.'" *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 82 (2d Cir. 2009) (quoting *Pagan*, 52 F.3d at 441).  To the extent, however, that Plaintiff's arguments require the Court to interpret ERISA and its

implementing regulations, the Court will review the interpretation of those laws de novo. *Halo v. Yale Health Plan*, 819 F.3d 42 (2d Cir. 2016).

With few exceptions, "[f]or a review under the arbitrary and capricious standard . . . a district court's review . . . is limited to the administrative record." *Valentine v. Aetna Life Ins. Co.*, 125 F. Supp. 3d 425, 438 (E.D.N.Y. 2015). The Second Circuit has "repeatedly said that a district court's decision to admit evidence outside the administrative record is discretionary," and that this "discretion ought not be exercised in the absence of good cause." *Wedge v. Shawmut Design & Const. Grp. Long Term Disability Ins. Plan*, 23 F. Supp. 3d 320, 337 (S.D.N.Y. 2014) (quoting *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 631 (2d Cir. 2008)). As neither party has argued that there is good cause to review evidence beyond the administrative record, the Court bases its holding on the record.

B.     Notice of Suspension

ERISA's implementing regulations state that: "No payment shall be withheld by a plan pursuant to this section unless the plan notifies the employee by personal delivery or first class mail during the first calendar month or payroll period in which the plan withholds payments that his benefits are suspended." 29 C.F.R. § 2530.203-3(b)(4). The notification is required to include "a general description of the plan provisions relating to the suspension of payments, a copy of such provisions, and a statement to the effect that applicable Department of Labor regulations may be found in § 2530.203-3 of the Code of Federal Regulations." *Id.* Further "the suspension notice shall inform the employee of the plan's procedure for affording a review of the suspension of benefits." *Id.* Section 11.7 of the Plan states: "A Pensioner whose benefits are suspended and a Participant who continues to work for a Contributing Employer beyond Normal Retirement Date shall receive (to the extent required under ERISA) a notice that includes the

19

information and complies with Department of Labor Regulations 29 C.F.R. § 2530.203-3(b)(4). Such notice shall be delivered by first class mail or personal delivery not later than the end of the first calendar month during which benefit payments are suspended." Dkt. No. 21-19 § 11.7.

Brightman has maintained through this litigation that she never received the required notice that her employment with PAGNY could lead to a suspension of her pension benefits. As a consequence, she maintains, the suspension of her benefits should never have been effective. On the parties' first motion for summary judgment, the Fund pointed to two letters it sent in September and October of 2016. The first letter warned her that she was engaging in Disqualifying Employment and that her pension would be suspended. Dkt. No. 50-2 at 4. The second letter informed her that the Fund had suspended her benefits, stating that since she had decided to continue working in a health-related field, no more payments would be made to her under the Plan until she retired. *Id*. at 6-7. Brightman maintained that she had never received the letters.

On the first motion for summary judgment, the Court remanded to the Fund for further consideration. The Court found that there were three issues that needed to be reevaluated. First, although the Fund had put the letters on the record, it had not presented any proof that the letters were actually sent to Plaintiff, "let alone by personal delivery or first-class mail, as required by the Plan and by ERISA." Dkt. No. 40 at 30. Second, Defendants' briefing indicated that "[a]lthough [Plaintiff] entered Disqualifying Employment as of January 1, 2016, the Fund's [sic] did not discover this fact until October 2016." *Id*. If the Fund discovered Plaintiff's Disqualifying Employment in October, the Court reasoned, it would be impossible for the Fund to have sent the warning letter in September 2016. *Id*. Third, the Court held that "even if the Plan had established that the letters were actually sent, it did not comport with the requirements

20

of law, in that the letters did not notify Plaintiff about her right to a review of the suspension of her benefits, which violates both the Plan and ERISA." *Id*. The Court gave the following directions to the Fund on remand: "If the Fund determines that Plaintiff's pension should be suspended, it must also address the issue of when Plaintiff first received adequate notice of the suspension. The Fund should obtain proof that the letters were actually sent to Plaintiff and provide adequate documentation supporting its finding. Plaintiff is owed benefits up and until the Fund can establish that it provided notification pursuant to the requirements of the Plan and 29 C.F.R. § 2530.203-3(b)(4)." *Id*. at 30-31.

On remand, the Fund produced records indicating that it had sent the two letters advising Brightman about the suspension of benefits by first class mail. Dkt. No. 50 at 110-133. It also found evidence to show that the September letter had been sent to PAGNY, also on September 2, 2016. Dkt. No. 50 at 4. The evidence contained in the administrative record addresses the Court's prior concerns about whether the suspension letters were sent. The Fund's internal records show that the Fund did mail the letters on September 2 and October 15 as it had previously averred. The records do not reflect when the Fund learned of Brightman's Disqualifying Employment but does reflect that it learned of it from the PAGNY contribution reports.

More difficult is the question whether the suspension letters were sufficient in light of the terms of the Plan and ERISA's implementing regulations. The Court held in its opinion addressing the first summary judgment motion that the language of the suspension notices was insufficient insofar as it did not notify Plaintiff of her right to a review of the suspension. In response to this concern, the Committee pointed out (1) that the Fund sent Brightman a copy of the Plan and its accompanying SPD, which included a description of the appeals process, in

December 2015, and again on September 24, 2016; and (2) the fact that Brightman was evidently

on notice about the appeals process already, because she was already in the midst of an

administrative appeal at the time when her benefits were suspended.  Dkt. No. 50 at 4.

As Chief Judge McMahon wrote in the first summary judgment decision, and Defendants

concede, the letters notifying Brightman of the suspension of her benefits did not strictly comply

with the language of 29 C.F.R. § 2530.503-3(b)(4).  Brightman contends that the language of 29

C.F.R. § 2530.203-3(b)(4) means that the information required must all be contained within a

single notice of suspension, or the suspension is invalid.  The fact that the Plan sent a copy of the

Plan/SPD with the appeals information separately three weeks later cannot, in her view, cure the

deficiency in the suspension letter.

The question is thus whether the failure of the Fund to comply strictly with the

requirements of the regulation is excused because the Fund substantially complied with the

regulation.  "Substantial compliance is a doctrine that forgives technical noncompliance for

purposes of a plan administrator's discretionary decision."  *Nichols v. Prudential Ins. Co. of Am.*

406 F.3d 98, 107 (2d Cir. 2006).  The Second Circuit has expressly reserved the question

whether substantial compliance with ERISA's procedural obligations will suffice.  *Nichols*, 406

F.3d at 107 (2d Cir. 2006); *see also Mohamed v. Sanofi-Aventis Pharmaceuticals*, 2009 WL

4975260, at *16 n.16 (S.D.N.Y. Dec. 22, 2009) ("[I]t appears to remain an open question in the

Second Circuit whether substantial compliance with ERISA's procedural obligations will

suffice.").  The five other circuits to have addressed the issue, however, have unanimously held

that substantial compliance with the procedural requirements of ERISA's implementing

regulations will excuse a technical violation.  *See Heller v. Fortis Benefits Ins. Co.*, 142 F.3d

487, 493 (D.C. Cir. 1998) (holding that, although an initial letter informing the plaintiff "of the

denial of his disability benefits did not conform to the requirements of the regulations, the procedures, when viewed in light of the myriad communications between claimant, her counsel and the insurer, [appear] sufficient to meet the purposes of [ERISA] in insuring that the claimant understood the reasons for the denial of [her benefits] as well as her rights to review of the decision.") (quotation marks and citation omitted); *Brehmer v. Inland Steel Indus. Pension Plan*, 114 F.3d 656, 662 (7th Cir. 1997) (holding that substantial compliance with ERISA's regulations regarding notice of a benefit denial is sufficient); *Ellis v. Metro. Life Ins. Co.*, 126 F.3d 228, 235 (4th Cir. 1997) ("[S]ubstantial compliance with the spirit of the regulation will suffice, for '[n]ot all procedural defects will invalidate a plan administrator's decision.'" (quoting *Brogan v. Holland*, 105 F.3d 158, 165 (4th Cir. 1997)); *Kent v. United Omaha Life Ins. Co.*, 96 F.3d 803, 807 (6th Cir. 1996) ("[W]hen claim communications are sufficient to fulfill the purposes of [ERISA] the claim decision will be upheld even if a particular communication does not meet those requirements."); *Sage v. Automation, Inc. Pension Plan & Tr.*, 845 F.2d 885, 895 (10th Cir. 1988) ("[n]ot every procedural defect will upset the decision of plan representatives.").

In order to determine when an administrator who violates a technical provision of ERISA's regulations might nonetheless be in substantial compliance with the regulations, "the purpose of [ERISA] and its implementing regulations . . . serves as our guide." *Donato v. Metro. Life Ins. Co.*, 19 F.3d 375, 382 (7th Cir. 1994).  In the closely related context of the notice required for benefit denials under ERISA, the Ninth Circuit has held that, "what this regulation calls for is a meaningful dialogue between ERISA plan administrators and their beneficiaries.  If benefits are denied . . . the reason for the denial must be stated in reasonably clear language, . . . [and] if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it."  *Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1463 (9th

Cir. 1997).  The purpose of the notice requirements in the context of ERISA benefit denials is

thus to ensure that a plan beneficiary is provided with a reasoned explanation for why the plan

has denied her request for benefits, and to inform her of the options available to her to challenge

the fund's determination.

Here, similarly, the purpose of 29 C.F.R. § 2530-503-3(b)(4) is readily apparent: to

provide the beneficiary with an explanation of why her benefits have been suspended and to

notify her of the proper procedure to follow, should she wish to appeal the suspension.  It is

uncontested that the notices the Fund sent to Brightman included the required explanation of the

suspension.  At issue is only the description of the appeals process.

Although the suspension notice letter did not include a description of the appeals process,

the Court concludes that the Fund was nonetheless in substantial compliance for two reasons.

First, Brightman was notified at least three times of the appeals process in separate

communications from the Fund.  The process was explained in the SPD and Plan documents that

the Fund sent her several times, including in (1) the March 1, 2015 NRA suspension notice; (2)

the December 17, 2015 Pension Explanation of Benefits; and (3) the copy of the Plan/SPD the

Fund sent to Brightman on September 24, 2016.  *See Donato*, 19 F.3d at 382 (holding that, where

a notice of denial of disability benefit did not include required material explaining the denial, but

plaintiff possessed reports upon which decision was based that "permitted a sufficiently clear

understanding of [the defendant's] decision," the administrator was in substantial compliance

with ERISA's regulations).  Although the suspension notice letter did not include the description

of the appeals process, the record shows that Brightman had already been repeatedly notified of

the process—a circumstance further evidenced by the fact that, prior to the suspension of her

benefits, Brightman had already appealed the way the Fund had calculated her credited service.

Second, though the suspension letter did not describe the appeals process, it mentioned that if she wished to challenge the Fund's determination, she should call the Fund at a number provided in the letter.  Brightman was thus on notice that there was an appeals process and that the process could be instigated by contacting the Fund.

The limited case law interpreting 29 C.F.R. § 2530.203-3(b)(4) similarly supports Defendants' position.  In *Dennis v. Board of Trs. of Food Emps. Labor Rels. Ass'n and United Food and Com. Workers Union Pension Fund*, 620 F. Supp. 572 (M.D. Pa. 1985), for instance, a court confronted a suspension notice that did not include a general description of the plan provisions relating to the suspension of benefit payments, a statement that the applicable regulations could be found in 29 C.F.R. § 2530, or a mention of the plan's procedure for appeal, all of which are required by 29 C.F.R. § 2530.203-3(b)(4).  Observing that plaintiffs' counsel had sought reconsideration of the Board's decision, the court held that, where a violation of the procedural rules for the provision of notice was "technical"—insofar as it had not interfered with plaintiffs' ability to seek review of the suspension decision—such a deficiency "[did] not warrant reinstatement of benefits."  *Id.* at 576; *see also*, *Canada v. Am. Airlines, Inc. Pilot Ret. Benefit Program*, 2010 WL 4877280, at \*16 (M.D. Tenn. Aug. 10, 2010) ("Procedural violations of ERISA do not give rise to substantive claims, at least where the plan participant is informed of the basis for the decision, and [plaintiff] has not shown how he was prejudiced by the allegedly deficient notice . . ."); *Monks v. Keystone Powdered Metal Co.*, 78 F. Supp. 2d 647, 670 (E.D. Mich. 2000) ("It is difficult to see how any of [the information required by 29 C.F.R. § 2530.203-3(b)(4)] would have better and more fully advised Plaintiff that he ran the risk of 'forfeiting' some of his pension benefits . . . if he continued working past the normal retirement age of 65.  Notably, [p]laintiff has not claimed that this additional information might have led

him to reconsider his decision to work past age 65, nor that this decision was based upon any
misapprehensions that might have been corrected had he been given this additional notice.");
*Logrande v. Loc. 851 Emp. Grp. Pension Plan*, 695 F. Supp. 92 (E.D.N.Y. 1988).

Similarly, here, Brightman has not—and cannot—allege that the Fund's failure to include
the description of the appeals process in the suspension letter led her to forfeit any rights under
the Plan or that she labored under any misapprehensions about the appeals process for her
suspension.  Brightman timely challenged the suspension in June of 2017 through the Fund's
appeals process.  Were she to have prevailed, she would have recovered the benefits that she lost
during the time her benefits were suspended.  Thus, the lack of explanation of the appeals
process in the suspension notice letter was purely technical, as the letter satisfied the purposes of
the regulations, even if it did not satisfy them to the letter.  Brightman has not shown how she
was prejudiced by the deficiencies in the notice and it does not appear on the record that she was.

Plaintiff finally argues that the Court has already decided that her benefits were
improperly suspended because of the deficiency of the notice letter in Chief Judge McMahon's
prior summary judgment decision in this case.  The Court disagrees.  Chief Judge McMahon
determined that the suspension notice letter did not comply with the requirements of ERISA's
implementing regulations.  Chief Judge McMahon did not determine what the legal effect of that
fact was, and instead remanded to the Fund for further consideration of the issue when
Brightman first received adequate notice.  Dkt. No. 40 at 30-31.  On remand, the Fund concluded
that Brightman had adequate notice, despite the suspension letters' failure to comply with the
letter of the regulations.  The Court now concludes that although the Fund did not comply with
the letter of the regulation, it was nonetheless in substantial compliance with the regulation and

the error was harmless.  This conclusion is not in conflict with the prior summary judgment decision.

For these reasons, summary judgment is granted in favor of Defendants on the issue whether Brightman was properly notified of the suspension of benefits.

C.      Benefits Calculation

In order for a court to overturn a denial of benefits under the arbitrary and capricious standard, the plaintiff must show that the administrator's decision was "without reason, unsupported by substantial evidence or erroneous as a matter of law."  *Miller*, 72 F.3d at 1072 (quoting *Pagan*, 52 F.3d at 442).  On this renewed motion for summary judgment, Brightman argues again that the Committee miscalculated the monthly benefit to which she was entitled.  At issue are the amounts that the Fund was using to calculate Plaintiff's "Regular Pay," which were then averaged to determine her "Average Final Pay."

Section 1.29 of the Plan defines "Regular Pay":

"Regular Pay" means for each Participant, his total pay in a Plan Year . . . during periods for which his Contributing Employer is required to make Contributions, *excluding overtime, on-call pay, commissions, bonuses and gratuities and expense allowances*, . . .

Dkt. No. 21, Ex. Q § 1.29 at 137 (emphasis added).

When it made its initial calculation of Plaintiff's benefits, the Retirement Committee used "industry standard" to determine her Regular Pay for all years except for 2013.  The "industry standard" calculation estimates Regular Pay by looking at a known payrate in a given week, and factoring in (or out) the bargained increases in the collective bargaining agreement.  "Industry standard" is used where the Committee is unable to obtain actual information about a Plan beneficiary's rate of pay.  *See id.* ("For periods for which the Fund office is unable to obtain actual pay information, Regular Pay shall be calculated utilizing industry standards through a

27

methodology approved by the Retirement Committee . . .").  When making its initial calculation, and before this Court on the first summary judgment motion, the Committee maintained that it had been unable to get Brightman's Regular Pay information from Corizon; instead, Corizon had provided the Committee with gross pay information, but had not furnished the Committee with payroll information that divided Brightman's pay into regular pay and overtime.

On the first summary judgment motion, the Court held that the Committee's use of industry standard rates was arbitrary and capricious.  The Committee had not shown that it had made reasonable efforts to obtain Plaintiff's actual pay information from Corizon and had not shown that it was unable to obtain it.  Dkt. No. 40 at 31.  The Court held that the administrative record did not show that the Committee had contacted Corizon again to attempt to get information on Brightman's base pay after Corizon had submitted the salary records that did not segregate overtime pay; nor did it contain evidence adequate to substantiate the Committee's contention that the information provided by Corizon did, in fact, include overtime pay.  *Id*. at 33. The Court also concluded that the evidence on the record did not support Defendants' claim that Corizon was no longer responsive to requests for documentation in the wake of losing its contract with the New York City Department of Corrections.  *Id*. at 34.

On remand, the Committee served a subpoena on Corizon, pursuant to which Corizon provided Brightman's pay information for the period from 2010 to 2014, including how much of her pay consisted of base salary and how much consisted of overtime.  Corizon informed the Committee that it did not have pay information for Brightman for years prior to 2010.  After reviewing that information, the Committee determined that it would have to use "industry standard" to calculate Brightman's pay for the earlier years of her employment with Corizon. Based upon these calculations, the Committee found that Brightman's five highest-paid years of

consecutive employment were 2009-2013.  Based on the new numbers, her AFP for the period

came out to $89,111.91.  That calculation resulted in a monthly benefit of $1,896.63 per month,

an amount modestly less than the $1,945.80 per month that the Committee had calculated based

on industry standard prior to Brightman's first summary judgment motion.

The Committee's determination was based upon an extensive record consisting of:

Exhibit I: Fund's written attempts, including 8/19 subpoena duces tecum to
Corizon Health, to obtain Ms. Brightman's Regular Pay information.
Exhibit 1: CK letter dated September 24, 2019
Exhibit 4: CK's handwritten paystub information submitted in 2017 (actual pay
stubs never produced)
Exhibit 6: Corizon letter dated October 10, 2019
Exhibit 7: Pension Department calculations showing Final Average Pay for the
years 2005-2009
Exhibit 8: League CBA excepts with wage increases
Exhibit G: The Pension Department's chart of calculations using the years 2010-
2014
Exhibit D: Corizon's payroll department reported Ms. Brightman's total annual
wages from 2010-2014, provided in the April 2017 Income Questionnaire
Exhibits E, I, and J: Corizon's HR Department payrate information from 2010-
2014
Exhibit 2: The Fund's letter dated September 17, 2019 explaining Industry
Standard
Exhibit 3: follow-up emails between CK on Fund on September 19 and 20, 2019,
answering questions about the calculations
Exhibit B: calculation breakdowns the Fund sent to Ms. Brightman's counsel on
Nov. 20, 2017
Plan Sections 1.29, 2.4

Dkt. No. 50 at 5.  The Committee also provided detailed explanations of the Industry Standard

calculations in letters to Plaintiff's counsel dated September 17, 2019 and October 15, 2019.  The

Committee also noted that Brightman had never provided any paystubs outside of her 2013

paystub; these paystubs would have allowed the Committee accurately to determine how much

of her pay was overtime and how much was regular pay.  Dkt. No. 50 at 6.

The Committee's calculation of Brightman's AFP was based upon substantial evidence.

The record shows that the Committee made every effort to obtain actual pay information for

Brightman, including serving subpoenas on Corizon and repeatedly asking Brightman to produce her paystubs.  The record also shows that the Committee did a thorough review of the evidence before it, and presented detailed reports to Plaintiff's counsel explaining in minute detail the methodology it employed to calculate industry standard rates for years prior to 2010.  After it obtained Plaintiff's payrate for the years 2010-2014 from Corizon, it used the 2010 payrate and backed out the CBA wage increases to calculate Plaintiff's rate of pay for the years 2005-2009. Then it calculated and compared Plaintiff's Regular Pay for every year between 2005 and 2014 and created a chart that showed each consecutive five-year scenario for total salary.  Dkt. No. 50, Ex. G.

Further, the record shows that the Committee considered the evidence that Brightman presented to it and found it lacking.  In particular, the Committee considered Brightman's argument, raised before it on remand for the first time, that Brightman's highest consecutive years of pay were 2005-2009.  Dkt. No. 50 at 5-6.  It looked at the evidence presented and concluded that Brightman's contention was impossible and in direct contradiction to other representations Brightman had made earlier in the dispute.  Because the record shows that the Committee gave the evidence before it a "full and fair" review and that it "evaluated all the evidence submitted" by Brightman, *Suarato v. Building Servs. 32BJ Pension Fund*, 554 F. Supp. 2d 399, 420 (S.D.N.Y. 2008), the Court cannot conclude that the Committee's calculation of Brightman's AFP was arbitrary and capricious.

In response, Plaintiff argues that the Fund miscalculated the AFP.  Her central argument is that the Fund incorrectly assumed that the five-year period in which her average pay was highest was the period from 2009-2013.  Dkt. No. 53-11 at 20-21.  Instead, she argues, she earned the most compensation in the period from 2005-2009.  In an exhibit appended to her

brief, Brightman puts forward salary amounts for those years that she claims in her brief were calculated according to industry standard. *Id*. at 21.  Brightman's figures are presented in the table below, and contrasted with the calculations of the Fund's pension department:

| Year | Pension Dept's Calculation | Brightman's Calculation |
|------|---------------------------|-------------------------|
| 2005 | $87,750.00 | $90,407.15 |
| 2006 | $90,163.51 | $92,887.66 |
| 2007 | $91,502.82 | $94,213.53 |
| 2008 | $94,247.83 | $97,091.86 |
| 2009 | $74,803.66 | $74,803.95 |
| 2010 | $89,703.21 | $89,703.21 |
| 2011 | $71,839.72 | $71,839.72 |
| 2012 | $104,280.80 | $101,731.50 |
| 2013 | $104,932.56 | $102,370.13 |
| 2014 | $65,709.46 | $58,724.08 |

Dkt. No. 50, Ex. 7; Dkt. No. 53, Ex. F.  Based on these numbers, Plaintiff argues that her AFP based upon the years from 2005 to 2009 should be $89,880.83, instead of the $89,111.99 calculated by the Fund, based upon her pay for the years 2009-2013.

Plaintiff's contentions do not persuade the Court that the Fund's calculation of Brightman's AFP was arbitrary and capricious.  In the first place, Brightman's alternative calculations of her AFP were not presented to the Committee on remand, which places them outside of the scope of the Court's review.  *See Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995) ("[I]n reviewing decisions of plan fiduciaries under the arbitrary and capricious standard, district courts may consider only the evidence that the fiduciaries themselves considered.").  Brightman never raised the argument that her highest paid years were 2005-2009, before a letter she sent to the Committee on remand on September 24, 2019.  There, however, she asked the Committee to find that she was paid $99,738.22 in each of the years from 2005-2008; an amount that the Committee concluded was impossible, because it exceeded the collectively bargained rate.  Dkt. No. 50 at 5.  Brightman additionally asked the Committee to

find that she was paid $81,056.92 in 2009, the amount of her gross earnings on her W-2. *Id.* As the Committee had previously concluded, Brightman could not rely on the earnings totals on her W-2s alone to determine her AFP, because her W-2s did not reflect how much of her pay was non-pensionable overtime. The Committee also noted that Brightman's position contradicted her claim during the pre-litigation appeal, when she represented that her "total 2006 wages as of pay date 12/29/06 was $17.533.08." Dkt. No. 50 at 6.

In order for the Court to conclude that the Committee's calculation of Brightman's AFP was arbitrary and capricious, Brightman would have to show that the Committee overlooked or disregarded evidence that would have supported her position. *See Zuckerbrod v. Phx. Mut. Life Ins. Co.*, 78 F.3d 46, 49 (2d Cir. 1996) (holding that, in evaluating whether a benefit denial was arbitrary and capricious, a court considers "whether [the defendant's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."). Brightman has not done so. The Committee considered her arguments and found them to be unpersuasive in light of the record before it. The Court cannot conclude that it was wrong to do so; and certainly not on the basis of salary calculations that Plaintiff did not present to the Committee and has not explained before the Court. Further, Plaintiff cannot rely on newly offered calculations of the Industry Standard amounts, that are lacking support or explanation and which she did not submit to the Committee for its evaluation. If Plaintiff wished to raise this argument, she had to present it to the Committee for its evaluation; indeed, the Court's first remand for further consideration was precisely for this purpose. *See Miller*, 72 F.3d at 1071 ("This rule [i.e., the requirement that courts review only the administrative record in ERISA benefit denial cases] is consistent with the fact that nothing 'in the legislative history suggests that Congress intended that federal district courts would function as substitute plan

32

administrators' and with the ERISA 'goal of prompt resolution of claims by the fiduciary.'")

(quoting *Perry v. Simplicity Eng'g, a Div. of Lukens Gen. Indus., Inc.*, 900 F.2d 963, 966 (6th Cir. 1990)).

In her reply, Brightman contends that the Court should consider the new evidence she has presented on this summary judgment motion, because there was no opportunity to present the evidence during the remand.  In particular, she argues that calculations attached to her summary judgment motion as Exhibit F, Dkt. No. 53, Ex. F, which purports to be her calculations of the industry standard and to show that her highest earning years were 2005-2009, could not have been presented to the Retirement Committee until after the Committee rendered its final decision.  But Brightman did argue before the Committee that 2005-2009 were the years where she earned the most, albeit on the basis on different numbers than those she now relies upon. There, she argued that she was paid $99,738.22 in each year from 2005 to 2008, but, as the Committee concluded, she presented no evidence for this figure, and indeed, that figure was impossible based upon the collectively bargained rate.  Thus, the Committee considered her argument about her pay from 2005-2009 and rejected it.  The Court is not required to reconsider this argument de novo simply because Brightman has presented it again with new and different alleged salary numbers.

Furthermore, as discussed above, just as she did before the Committee on remand, Brightman does not explain how she arrived at the figures she proposes for the Industry Standard from 2005 to 2009.  She provides no documentation of the evidence she used nor anything more than a cursory explanation of the calculations she employed.  Had Brightman provided bona fide evidence showing that the Committee had miscalculated the Industry Standard numbers based upon its own formulas, then perhaps the evidence could be evaluated to determine if the

Committee had acted arbitrarily and capriciously.  But Brightman has presented nothing more than a list of slightly different numbers than those established by the Committee that she asks the Court to assume are correct without providing any basis for that assumption.  In the absence of any rationale for accepting this evidence, the Court cannot consider it and certainly cannot conclude that the Committee erred in its calculations, which are supported by ample documentation and explanation.

For these reasons, Defendants' motion for summary judgment is granted with respect to Brightman's claims related to the calculation of her AFP.

> D.      Attorneys' Fees

Section 502(g)(1) of ERISA provides that a "court in its discretion may allow a reasonable attorney's fee and costs of action to either party."  29 U.S.C. § 1132(g)(1).  Because "Congress intended the fee provisions of ERISA to encourage beneficiaries to enforce their statutory rights," *Slupinksi v. First Unum Life Ins. Co.*, 554 F.3d 38, 47 (2d Cir. 2009), a court may award attorneys' fees even to a party that does not prevail, *Miller*, 72 F.3d at 1074, so long as the "fee claimant has achieved 'some degree of success on the merits.'"  *Hardt v. Reliance Std. Life Ins. Co.*, 560 U.S. 242, 255 (2010) (citing *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 694 (1983)); *see also Locher v. Unum Life Ins. Co. of Am.*, 389 F.3d 288, 298 (2d Cir. 2004) ("ERISA's attorney's fee provisions must be liberally construed to protect the statutory purpose of vindicating retirement rights.") (quoting *Chambless v. Masters, Mates & Pilots Pension Plan*, 815 F.2d 869, 872 (2d Cir. 1987)).  "A claimant does not satisfy that requirement by achieving 'trivial success on the merits' or a 'purely procedural victor[y],' but does satisfy it if the court can fairly call the outcome of the litigation some success on the merits without conducting a 'lengthy inquir[y] into the question whether a particular party's success was 'substantial' or

34

occurred on a 'central issue.'" *Id*. at 255 (quoting *Ruckelshaus*, 463 U.S. at 688 n.9).  Plaintiff's counsel has requested a fee award, claiming that it has had some success on the merits, even if it loses on this summary judgment motion.

Prior to the Supreme Court's decision in *Hardt*, the Second Circuit employed a five-factor test for evaluating the appropriateness of fee awards pursuant to ERISA, set forth in *Chambless*, 815 F.2d at 871.  The factors are:

> (1) the degree of opposing parties' culpability or bad faith; (2) ability of opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions.

*Hardt*, 560 U.S. at 249 n.1.  After the Supreme Court's decision in *Hardt*, the Second Circuit has held that a district court "may apply—but is not required to apply—the *Chambless* factors" when it uses its discretion to determine a fee award.  *Toussaint v. JJ Weiser*, 648 F.3d 108, 110 (2d Cir. 2011).  "So long as a party has achieved some degree of success on the merits, a court in its discretion may allow a reasonable attorney's fee."  *Id*. (internal citations and quotation marks omitted).  "In other words, if a court chooses to consider factors other than a plaintiff's 'success on the merits' in assessing a request for attorneys' fees, *Chambless* still provides the relevant framework in this Circuit, and courts must deploy that useful framework in a manner consistent with [the Second Circuit's] case law."  *Donachie v. Liberty Life Assurance Co. of Bos.*, 745 F.3d 41, 47 (2d Cir. 2014).

Though the parties have briefed the *Chambless* factors, the Court need not reach them, because the Supreme Court's decision in *Hardt* resolves the issue:  Plaintiff, having lost on every issue of substance in this case, has not had "success on the merits" entitling her counsel to fees.

On her prior summary judgment motion, she lost on her claims that she should be credited for years of service with her prior employer and that her period of past service should be credited at the future service rate.  She won a remand on the issue of the calculation of her AFP and whether she had been properly notified of the suspension of her benefits.  On remand, however, once the Fund complied with the Court's order and obtained Plaintiff's payroll records by subpoena, it was revealed that Plaintiff was, in fact, entitled to a smaller pension than the one the Fund had calculated based upon the Industry Standard numbers.

After all, the end result of this litigation, which has continued for nearly three years, will be a modest reduction in the amount of Brightman's monthly pension.  In such a scenario, it would be unreasonable for the Court to reward Brightman's counsel as having achieved "success on the merits."  *See IBEW-NECA Defined Contribution Plan v. Bank of N.Y. Mellon*, 2013 WL 1189681, at *5-6 (S.D.N.Y. 2012) (finding no success on the merits and denying fees where the litigation placed Plaintiff in a worse position than he would have been had he never brought the case).  To do so would be to reward counsel for prosecuting a case that leaves its client in a worse position than she would have been had she never brought the case in the first place.

Plaintiff's counsel claims that it had "some success on the merits" insofar as it achieved a remand to the Committee for further consideration of some issues on the first summary judgment motion.  But that is precisely the type of "purely procedural victory" that the Supreme Court held in *Hardt* cannot entitle a party to a fee award.  Counsel's partial victory on the first summary judgment motion was a Pyrrhic one, as the result of the remand was a reduced pension for the client.  Having achieved a result that set back the client, rather than advanced her, counsel is not entitled to fees.

36

It is true that the Committee awarded Plaintiff pension benefits for the months of November 2016 to June 2017, though it continued to maintain that it was not legally obligated to. As discussed above, the Court agrees that the suspension of benefits was valid and lawful.  Thus, although Plaintiff received some benefit as the result of the argument, it cannot be considered a "success on the merits."

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED and Plaintiff's motion for summary judgment is DENIED.  Plaintiff's counsel's request for fees is DENIED.  The Clerk of Court is respectfully directed to close the case.

SO ORDERED.

Dated: March 2, 2021
     New York, New York

LEWIS J. LIMAN
United States District Judge